TA CHEN STAINLESS STEEL PIPE,
INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–1048.

United States Court of Appeals,
Federal Circuit.

Aug. 1, 2002.

Peter J. Koenig, Miller & Chevalier, of Washington, D.C., argued for plaintiff-appellant. With him on the brief were Joel Davidow, and Kristen S. Smith.

Mark L. Josephs, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Velta A. Melnbrencis, Assistant Director.

Before MAYER, Chief Judge,
GAJARSA and LINN, Circuit Judges.

LINN, Circuit Judge.

Ta Chen Stainless Steel Pipe, Ltd. ("Ta Chen") appeals a judgment of the United States Court of International Trade affirming a United States Department of Commerce ("Commerce") remand determination applying partial adverse facts available to certain Ta Chen sales of welded stainless steel pipe ("steel pipe") and setting the import duty at the highest available dumping margin. *Ta Chen Stainless Steel Pipe, Inc. v. United States*, No. 97–08–01344, 2000 WL 1225799 (CIT Aug. 25, 2000) ("*Ta Chen II*"). Because Commerce's decision is supported by substantial evidence and is otherwise in accordance with the law, we affirm.

## BACKGROUND

Ta Chen is a Taiwanese producer and exporter of steel pipe. Through August 1994, Ta Chen sold steel pipe through a U.S. distributor, Sun Stainless, Inc. ("Sun"). From September 1993 to July 1995, Sun was owned by Frank McClane, a former minority shareholder of Ta Chen, and managed by Ken Mayes, a former consultant to Ta Chen. Ta Chen had custody of Sun's signature stamp as well as unlimited access to Sun's accounts receivable, accounts payable, and inventory and pricing information. Ta Chen also participated in negotiations of Sun's sales of steel pipe. Ta Chen, however, had no equity ownership in Sun. On July 3, 1995, McClane sold 80% of Sun's stock to Picol International ("Picol"), a foreign corporation, and the remaining 20% to Mr. Masaru Kimura, thereby fully divesting himself of ownership.

In 1992, certain U.S. producers of steel pipe ("petitioners") filed an antidumping petition with Commerce alleging that steel pipe imported from Taiwan was being sold domestically at a lower price than it was being sold under similar conditions in Taiwan. On January 18, 1994, Commerce initiated an administrative review of certain steel pipe imported from Taiwan covering a period from 1992 to 1993. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 59 Fed. Reg. 2593 (Dep't Commerce Jan. 18, 1994). On January 13, 1995, Commerce initiated a second review covering a period from 1993 to 1994. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 60 Fed.Reg. 3192 (Dep't Commerce Jan. 13, 1995). On February 1, 1996, Commerce initiated a third review covering a period from December 1, 1994, through November 30, 1995. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 61 Fed.Reg. 3670 (Dep't Commerce Feb. 1, 1996). The three reviews were conducted concurrently, and preliminary determinations for all three were published during the first half of 1997. *See Certain Welded Stainless Steel Pipe from Taiwan; Preliminary Results of Antidumping Duty Administra-*

*tive Reviews,* 62 Fed.Reg. 26,776 (Dep't Commerce May 15, 1997) (*"Combined First and Second Review Preliminary Results"*); *Certain Welded Stainless Steel Pipe from Taiwan; Preliminary Results of Administrative Review,* 62 Fed.Reg. 1435 (Dep't Commerce Jan. 10, 1997) (*"Third Review Preliminary Results"*). The third review is the subject of this appeal.

During the first review, petitioners called Commerce's attention to Ta Chen's potential affiliation with Sun and certain other parties under the then existing Tariff Act. *See Certain Welded Stainless Steel Pipe from Taiwan; Final Results of Administrative Review,* 64 Fed.Reg. 33,243, 33,244 (Dep't Commerce June 22, 1999) (*"First and Second Review Final Results"*); 19 U.S.C. § 1677(13) (1988). At that time, Ta Chen denied the allegations of affiliation and provided no information concerning its relationship with Sun. Ta Chen later argued before Commerce that it was not affiliated with Sun during the period of review because under the law at the time, foreign exporters were "affiliated" with their U.S. customers only if the exporter owned at least 5% of the customer. *First and Second Review Final Results,* 64 Fed.Reg. at 33244–45; *see also* 19 U.S.C. § 1677(13) (1988) (repealed by Pub.L. No. 103–465, Title II § 222(i)(2), Dec. 8, 1994, 108 Stat. 4876). Petitioners renewed their allegations in a submission filed with Commerce on July 12, 1995, and presented additional information regarding Ta Chen's potential affiliation with Sun. *First and Second Review Final Results,* 64 Fed.Reg. at 33,244–45. Ta Chen again denied the allegations. *Id.*

Effective January 1, 1995, Congress modified U.S. trade law and broadened the definition of "affiliated persons." *See* Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994); *compare* 19 U.S.C. § 1677(33) (2000), *with*

19 U.S.C. § 1677(13) (1988). Under the new definition, if an exporter has operational control over its U.S. customer, the exporter is affiliated regardless of ownership. *See* 19 U.S.C. § 1677(33). The third antidumping review of Ta Chen was initiated under this broadened standard. As part of the third review, Commerce issued a general questionnaire to Ta Chen concerning affiliated importers, giving Ta Chen notice of the broader definition of affiliated parties. Ta Chen's response to the questionnaire, however, did not include information about Sun. *First and Second Review Final Results,* 64 Fed.Reg. at 33,-244. Commerce then issued a supplemental questionnaire to Ta Chen specifically requesting information regarding its affiliation with Sun. In response, Ta Chen provided some of the requested information Sun's 1995 financial statement, for example but did not provide any information regarding sales data. *Id.; Third Review Preliminary Results,* 62 Fed.Reg. at 1436.

In reviewing the information provided, Commerce determined that Ta Chen was affiliated with Sun during the third review period. *Certain Welded Stainless Steel Pipe from Taiwan; Final Results of Administrative Review,* 62 Fed.Reg. 37,543, 37,544 (Dep't Commerce July 14, 1997) (*"Third Review Final Results"*); *see also First and Second Review Final Results,* 64 Fed.Reg. at 33,244. Commerce further determined that Ta Chen had failed to act to the best of its ability to provide information on Sun's U.S. sales and consequently would be subject to the highest dumping margin from the facts otherwise available. *Third Review Final Results,* 62 Fed.Reg. at 37,544. Ta Chen appealed to the Court of International Trade. *Ta Chen Stainless Steel Pipe, Ltd. v. United States,* 23 C.I.T. 804 (Ct. Int'l Trade 1999) (*"Ta Chen I"*). The court affirmed the determination that Ta Chen and Sun were affiliated but reversed and remanded the determination to

apply adverse facts available. *Id.* at 818, 821. The court found that Commerce violated 19 U.S.C. § 1677m(d) by not providing adequate notice to Ta Chen that it was required to furnish Sun's U.S. sales data. *Id.* at 821. The court remanded for further review by Commerce after ·Ta Chen had been given an adequate opportunity to provide Sun's sales data. *Id.*

During the remand review, Commerce issued another questionnaire seeking Sun's sales data. Ta Chen forwarded the questionnaire to Sun, asked Sun to complete it, and offered "any and all assistance" in answering it. On November 25, 1999, Sun's counsel notified Ta Chen that Sun would not cooperate with the Commerce inquiry because it had been closed since 1996 and had no operations in the United States, making a response too burdensome and costly. Sun's counsel stated, however, that he would urge Sun to reconsider. After Ta Chen successfully sought two extensions of time to submit the requested information to Commerce, Sun's counsel notified Ta Chen that Sun still would not cooperate with the request. The following day Ta Chen informed Commerce that further attempts to retrieve the Sun data would be "futile."

Upon remand, Commerce found that "Ta Chen has withheld or failed to provide the information requested regarding·Sun's U.S. sales despite repeated notification of the deficiency...." *Certain Welded Stainless Steel Pipe from Taiwan, Final Results of Redetermination Pursuant to Court Remand,* No. 97–08–01344, slip op. 99–117 at 3 (Dep't Commerce Feb. 25, 2000) ("*Remand Results*"). Commerce further found that Ta Chen "failed to act to the best of its ability in responding to the Department's request for information regarding Sun's U.S. sales." *Id.,* slip op. at 3–4. Without the requested sales data and pursuant to 19 U.S.C. § 1677e(b), Commerce applied facts otherwise available

and· used an adverse inference to apply the highest available dumping margin. *Id.,* slip op. at 4. Commerce calculated that margin at 30.95%. *Id.,* slip op. at 13.

On appeal, the Court of International Trade affirmed the Commerce remand determination. The court found substantial evidence that Ta Chen had not complied to the best of its ability with Commerce's request for information on Sun's sales. *Ta Chen II,* slip op. at 13. The court noted that while Ta Chen may have had reason to argue it was not affiliated with Sun under the changing definitions of "affiliated party," it was nevertheless on notice as early as July 1994 that its relationship with Sun was at issue and that Sun's sales might be later construed as constructed export price sales. *Id.,* slip op. at 9–10. The court, therefore, found that Ta Chen "could have, and should have, preserved its information on Sun's sales in order to provide full information for the Department." *Id.,* slip op. at 10.

The court also affirmed Commerce's application of a 30.95% dumping margin, noting that the adverse facts available involved a price and quantity neither unusually high nor unusually low and drawn from sales of a normal product. *Id.,* slip op. at 19. The court then concluded that the rate chosen by Commerce was not aberrant, as Ta Chen contended, but rather was indicative of Ta Chen's sales. *Id.,* slip op. at 22. The court added that "the methodology chosen by Commerce was the only way to apply an adverse inference in this case, while still using [Ta Chen's] own information." *Id.,* slip op. at 22.

On appeal to this court, Ta Chen challenges both (1) the decision by Commerce to impose partial adverse facts available on Ta Chen and (2) the selection of 30.95% as the dumping margin. The government argues that the court properly sustained

Commerce's application of partial adverse facts available based on Ta Chen's failure to cooperate to the best of its ability. The government further argues that the 30.95% dumping margin is both supported by substantial evidence and otherwise in accordance with the law. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

### A. STANDARD OF REVIEW

 We review a decision of the Court of International Trade evaluating an antidumping determination by Commerce by reapplying the statutory standard of review that the Court of International Trade applied in reviewing the administrative record. *Mitsubishi Heavy Indus., Ltd. v. United States,* 275 F.3d 1056, 1060 (Fed.Cir.2001). Commerce's special expertise in administering the anti-dumping law entitles its decisions to deference from the courts. *See, e.g., Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1394 (Fed. Cir.1997); *Torrington Co. v. United States,* 68 F.3d 1347, 1351 (Fed.Cir.1995); *see also Chevron USA, Inc. v. Nat'l Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000); *Micron Tech.,* 117 F.3d at 1393. "Substantial evidence" has been defined as "more than a mere scintilla," as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that "fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed.Cir.1984).

 Ta Chen's contention that the imposition of adverse facts available was an "abuse of discretion" is a misstatement of the proper standard of review. While certain appeals from antidumping duty proceedings follow the "arbitrary, capricious, abuse of discretion" standard, this appeal reviews a final determination by Commerce under 19 U.S.C. § 1675 other than a determination reviewable under 19 U.S.C. § 1516a(a)(1). *See* 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000). Therefore, we review the decision under the substantial evidence standard of section 1516a(b)(1)(B)(i) as opposed to the "arbitrary, capricious, abuse of discretion" standard of section 1516a(b)(1)(A).

### B. IMPOSITION OF PARTIAL ADVERSE FACTS AVAILABLE

Ta Chen argues three distinct errors in Commerce's imposition of partial adverse facts available. First, it argues that the record does not support the factual finding that it was affiliated with Sun. Second, it contends that the Court of International Trade impermissibly affirmed Commerce's decision on grounds not invoked by Commerce. Finally, it argues that Commerce violated 19 U.S.C. § 1677m by not notifying Ta Chen of deficiencies in its information gathering efforts before imposing partial adverse facts available. The government responds by arguing that the Court of International Trade properly affirmed Commerce's decision because Commerce's decision to impose partial adverse facts available is supported by substantial evidence of record. The government also contends that the Court of International Trade did not affirm Commerce's decision on alternative grounds, but decided the case on the same grounds invoked by the agency. Finally, the government argues that Commerce complied with 19 U.S.C. § 1677m because Commerce was not required to notify Ta Chen that its complete

failure to respond was deemed non-responsive.

### 1. Ta Chen's Affiliation with Sun

█ Ta Chen argues that Commerce erroneously imposed partial adverse facts available upon Ta Chen based on "unsupported speculation" that Ta Chen was affiliated with Sun's successor, Picol. We disagree with that characterization of Commerce's decision. Substantial evidence supports the factual determination that Ta Chen and Sun were affiliated during the relevant period of review. "Affiliated persons" includes any group in which one person controls another. *See* 19 U.S.C. § 1677(33)(G) (2000). "[A] person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." *Id.* Commerce's factual determination is supported by evidence that: (1) Sun was owned by a former minority shareholder of Ta Chen and managed by a former Ta Chen consultant, and (2) Ta Chen had custody of Sun's signature stamp and full access to Sun's accounting and pricing information.

█ Contrary to Ta Chen's arguments, Commerce did not impose partial adverse facts available upon Ta Chen because Ta Chen was related to Picol in 1999. Rather, Commerce did so because Ta Chen was affiliated with Sun during the period of review and then subsequently failed to act to the best of its ability to provide information on Sun's U.S. sales. Ta Chen bore the burden of creating an accurate record. *See Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1583 (Fed.Cir.1993) ("The burden of production [belongs] to the party in possession of the necessary information."). Ta Chen was on notice as early as 1994 that its relationship with Sun was raised before Commerce by the petitioners in the first review period. While it is true that a respondent to a Commerce inquiry

only has an obligation to produce data requested by Commerce, *see* 19 U.S.C. § 1677e(b), it is reasonable in this case for Commerce to expect Ta Chen to preserve its records in the event that Commerce itself would request them, which it actually did in October 1996. When Sun was sold without preserving the records of Sun's sales, Ta Chen bore the risk that Commerce would request the sales data previously alleged to be evidence of dumping activity. Thus, we will not disturb Commerce's decision to apply partial adverse facts available on Ta Chen because of its former affiliation with Sun and its subsequent inability to procure Sun's sales data.

### 2. The Basis for the Court of International Trade's Decision

█ Ta Chen argues that the Court of International Trade impermissibly affirmed Commerce's decision on grounds not articulated by Commerce. We disagree. Ta Chen notes that a "fundamental rule of administrative law [is] that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *but see; Fleshman v. West,* 138 F.3d 1429, 1433 (Fed.Cir.1998) (noting that a court may affirm on a new ground if the new ground is not a determination which the agency alone is authorized to make); *Killip v. Office of Pers. Mgmt.,* 991 F.2d 1564, 1568–69 (Fed.Cir.1993) (noting that a court may affirm on a different interpretation of a statute or regulation "when upholding the Board's decision does not depend upon making a determination of fact not previously made by the Board"). Here, however, the Court of International Trade did not affirm Commerce's decision on alternative grounds. In its *Remand Results,*

Commerce explained its decision to use an adverse inference against Ta Chen as follows:

> [I]t has already been established that Ta Chen had operational control over Sun and had access to its sales and pricing data. Ta Chen knew that Sun's U.S. sales were an issue both in the administrative review and in this litigation and that there was a possibility that Ta Chen would be requested to provide those records once again.... Accordingly, Ta Chen should have taken steps to obtain and preserve the relevant records. It cannot now rely on the fact that Sun is no longer in business to justify its failure to produce the necessary documentation.

*Remand Results,* slip op. at 4. The Court of International Trade opinion reflects that it approved the grounds invoked by Commerce:

> Ta Chen does not and cannot contest the fact it had operational control of Sun. The [Court of International Trade previously] found Commerce's affiliation finding supported by substantial evidence due to the numerous connections between Ta Chen and Sun. It is reasonable for the Department to conclude that this operational control gave Ta Chen access to Sun's records. This conclusion is further supported by the fact that Ta Chen was able to provide other confidential records from Sun, such as Sun's federal income tax records. It is also reasonable for Commerce to expect Ta Chen to maintain any relevant records pending the final outcome of the administrative review. In order to comply to the best of its ability, Ta Chen should have preserved Sun's information in the event that its sales were classified as [constructed export price sales].

*Ta Chen II,* slip op. at 8–9 (internal citations omitted).

Ta Chen compares one sentence in *Ta Chen II* to one sentence in the *Remand Results* for the proposition that the Court of International Trade affirmed the Commerce decision on alternative grounds. In the *Remand Results,* Commerce noted that "Ta Chen had notice that its relationship with Sun in particular, raised a question with the Department as to affiliation at least as early as October 1996." *Remand Results,* slip op. at 9. The Court of International Trade opinion states that "[a]s early as July 1994, Ta Chen knew its relationship with Sun was at issue because the petitioners had called it to the Department's attention in the first administrative review." *Ta Chen II,* slip op. at 9. While the different opinions cite different dates regarding when Ta Chen knew that its relationship with Sun was an issue before Commerce, the Court of International Trade's reasoning is not inconsistent with the grounds invoked by Commerce. Commerce found that Ta Chen was on notice "*at least* as early as October 1996," while the Court of International Trade pinned the date as July 1994. Those time periods are not mutually exclusive. Moreover, reliance on Ta Chen's notification in October 1996 the same year that Picol closed would be sufficient to uphold Commerce's decision. Because both Commerce and the Court of International Trade considered the notice of affiliation as just one factor in their conclusion that Ta Chen failed to act to the best of its ability to provide information on Sun's U.S. sales, we conclude that the Court of International Trade did not deviate from its duty to review only the decision made by Commerce.

3. Commerce's Compliance With 19 U.S.C. § 1677m

■ Ta Chen argues that Commerce violated 19 U.S.C. § 1677m by failing "to notify Ta Chen of any deficiencies in Ta Chen's efforts to induce Picol's coopera-

tion" before imposing partial adverse facts available. We disagree with Ta Chen's interpretation of the statute. The pertinent subsection, entitled "Deficient submissions," provides in part:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d) (2000). The Court of International Trade in *Ta Chen I* remanded Commerce's first attempt to impose adverse facts available upon Ta Chen because Commerce failed to comply with the statute by not providing adequate notice to Ta Chen that it was required to furnish Sun's sales data. *Ta Chen I*, 23 C.I.T. at 821. Upon remand, Commerce issued a questionnaire to Ta Chen specifically seeking Sun's sales data. Following issuance of the specific questionnaire and the *Remand Results*, the Court of International Trade in *Ta Chen II* found no violation of the statute. *Ta Chen II*, slip op. at 12–13.

We find no error in the Court of International Trade's application of the statute to the facts in this case. After being given a specific chance to get Sun's sales data, Ta Chen completely failed to provide Commerce the data. Commerce granted Ta Chen two extensions of time to try to get the information, but Ta Chen's counsel eventually informed Commerce that further efforts would be "futile." Under such circumstances where, following an opportunity to gather more information, a party informs Commerce that it will not provide

the information requested, Commerce is not required to give another formal notice that the complete failure to respond does not comply with the request. Ta Chen knew that "the nature of the deficiency" was its complete failure to respond. The statute only applies when a "response to a request" is deemed to not comply. A failure to respond is not the same as a "response" as required by the statute. Therefore, Commerce was under no statutory duty to formally tell Ta Chen that its failure to respond was deficient.

## C. SELECTION OF THE 30.95% DUMPING MARGIN

Ta Chen argues that the 30.95% dumping margin was unsupported by substantial evidence and otherwise not in accordance with the law for several distinct reasons. Specifically, Ta Chen contends that (1) the margin selected was aberrant and not representative, and (2) Commerce impermissibly selected the high margin solely for deterrence. The government argues that Commerce properly derived the 30.95% dumping margin from Ta Chen sales during the period of review and corroborated the rate by comparing the relevant sale to Ta Chen's other sales in terms of price, quantity and product.

### 1. The Factual Basis for the Selected Dumping Margin

As this court recognized in *F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed.Cir.2000) ("*De Cecco* "), the antidumping statute leaves much to agency discretion in making anti-dumping determinations. *See also Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir.1983) ("The Secretary has broad discretion in executing the [anti-dumping] law."). In the case of uncooperative respondents, the discretion granted by the

statute appears to be particularly great, allowing Commerce to select among an enumeration of secondary sources as a basis for its adverse factual inferences. *See* 19 U.S.C. § 1677e(b) (2000). In cases in which the respondent fails to provide Commerce with the most recent pricing data, it is within Commerce's discretion to presume that the highest prior margin reflects the current margins. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed.Cir.1990).

It is undisputed that Ta Chen made a sale with a 30.95% dumping margin. Ta Chen argues that the selected sale represented only 0.04% of Ta Chen's sales during the period of review and was thus aberrant. Ta Chen cites *De Cecco* for the proposition that Commerce may not select an aberrant dumping margin when applying adverse facts available upon a respondent. *De Cecco* is distinguishable from this case. In *De Cecco*, the Court of International Trade rejected Commerce's application of a 46.67% dumping margin because that margin was "thoroughly discredited" and uncorroborated by Commerce's own investigation. *De Cecco*, 216 F.3d at 1032. Here, the 30.95% dumping margin is corroborated by actual sales data, and Ta Chen admits that it is reflective of some, albeit a small portion, of Ta Chen's actual sales. So long as the data is corroborated, Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference. *Id.*

2. The Motivation Behind the Selection of the Dumping Margin

■ Ta Chen also argues that Commerce selected the 30.95% dumping margin solely for deterrence, contrary to this court's holding in *D & L Supply Co. v. United States*, 113 F.3d 1220 (Fed.Cir. 1997). In *D & L Supply*, a Chinese exporter of iron castings was subject to several administrative reviews of Commerce

dumping orders. The exporter cooperated with Commerce from 1987 through 1990 by answering Commerce's antidumping questionnaires. For the 1989–90 review, Commerce calculated a 92.74% dumping margin. While Commerce was still conducting the administrative review for 1989–90, it initiated an administrative review for 1990–91. That year, the exporter did not cooperate with Commerce's investigation. Without the actual sales data for 1990–91, Commerce selected a dumping margin using the best information available ("BIA") rate, which was the precursor to the current "adverse inference" from "facts otherwise available" rule. Commerce used the 1989–90 rate of 92.74%, as it was the highest antidumping duty rate from any prior administrative review. *Id.* at 1221–22.

Upon a challenge in the Court of International Trade, the court found that the rate for the 1989–90 review was erroneous and remanded the cases for both years. Commerce then recalculated the rate for 1989–90, but nevertheless used the 92.74% rate for the 1990–91 period under the BIA rule. Commerce argued to this court that it could use a subsequently invalidated dumping margin as the basis for calculating the BIA rate because the BIA rate is supposed to be sufficiently high to induce respondents to cooperate with Commerce's dumping investigations. This court reversed, holding that "[i]nformation that has conclusively been determined to be inaccurate does not qualify as the 'best information' under any test...." *Id.* at 1223. This court further held that Commerce could not select a rate based solely on Commerce's interest in inducing foreign exporters to cooperate with Commerce's investigations. Rather, the rate must have some relationship to commercial practices in the particular industry. *Id.* at 1223–24.

This case is distinguishable from *D & L Supply*. Here, unlike the exporter in *D & L Supply*, the dumping margin selected by Commerce was corroborated by Ta Chen's sales data. While Commerce may have chosen the 30.95% rate with an eye toward deterrence, Commerce acts within its discretion so long as the rate chosen has a relationship to the actual sales information available. Since *D & L Supply*, this court recognized that Commerce may consider deterrence when selecting an adverse inference dumping margin.

> It is clear from Congress's imposition of the corroboration requirement in 19 U.S.C. § 1677e(c) that it intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance. Congress could not have intended for Commerce's discretion to include the ability to select unreasonably high rates with no relationship to the respondent's actual dumping margin. Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.

*De Cecco*, 216 F.3d at 1032. Because Commerce selected a dumping margin within the range of Ta Chen's actual sales data, we cannot conclude that Commerce "overreached reality." Thus, we will not disturb Commerce's selection of the 30.95% dumping margin.

## CONCLUSION

Commerce's decision is supported by substantial evidence and is otherwise in accordance with the law. Commerce properly decided to apply partial adverse facts available upon Ta Chen for its failure to preserve Sun's sales data. Furthermore, Commerce acted within its discretion when it selected the highest available dumping margin reflected in the actual sales data before it. Therefore, we affirm the decision of the Court of International Trade.

*AFFIRMED.*

GAJARSA, Circuit Judge, dissenting.

I respectfully dissent. The decision of the United States Department of Commerce ("Commerce") is not in accordance with law. I would therefore reverse the decision of the Court of International Trade ("CIT"), which affirmed Commerce's decision. In affirming the CIT's judgment, the panel majority holds that Commerce was authorized to impose adverse facts against Ta Chen because Ta Chen failed to furnish Commerce with the United States sales data of another company, one of its former distributors, Sun Stainless, Inc. ("Sun"). When Commerce specifically requested that Ta Chen provide Sun's sales data, on November 9, 1999, Sun had been sold to a foreign corporation, and had ceased conducting business in the United States. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, No. 97–08–01344, slip op. 00–107, 2000 WL 1225799, at *1 (CIT Aug. 25, 2000) (*"Ta Chen II"*). According to the majority, Ta Chen "bore the risk" of this outcome because Ta Chen failed to obtain and preserve Sun's resale data before Commerce ever requested it. *Ante* at 1336. The majority reaches this determination despite the fact that the pertinent statutes authorize Commerce to impose an adverse inference only after an importer fails to comply to the best of its ability with a request for information, 19 U.S.C. § 1677e(b) (2000), and only after Commerce has provided the importer "with an opportunity to remedy or explain the defi-

ciency," 19 U.S.C. § 1677m(d) (2000). The majority concludes that Commerce may penalize importers for failure to engage in divination. I disagree with this conclusion and the reasoning from which it materializes.

Section 1677e(b) authorizes Commerce to assess an importer's response to a request for information. In response to a request by Commerce, importers must use their best efforts to provide the requested information. Commerce may impose an adverse inference only if an importer fails to respond with best efforts, 19 U.S.C. § 1677e(b) (2000), and fails to remedy or explain the deficiency, 19 U.S.C. § 1677m(d). Neither statute authorizes Commerce to impose an adverse inference on the grounds that an importer failed to predict a future request and take affirmative steps to obtain information before Commerce requested it. But this is precisely what Commerce did—impermissibly—to Ta Chen. *See FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed.Cir. 2002) (holding that the absence of a statutory prohibition cannot serve as a source of Commerce's authority in antidumping cases).

A careful review of the sequence of events demonstrates that Commerce exceeded the scope of its statutory authority by imposing adverse facts against Ta Chen. In 1992, domestic stainless steel pipe producers ("the petitioners") filed an antidumping petition with Commerce. The petitioners alleged that certain welded stainless steel pipe from Taiwan was being "dumped," or sold to United States customers at less than fair value. Commerce investigated. It determined that welded stainless steel pipe from Taiwan was being sold at less than fair value, and issued an antidumping order. *Certain Welded Stainless Steel Pipe from Taiwan*, 57 Fed. Reg. 62,300 (Dep't Commerce Dec. 30, 1992) (amended final determination and antidumping duty order). Commerce initiated three administrative reviews covering three separate periods: June 1992 to November 1993 ("the first review period"), December 1993 to November 1994 ("the second review period"), and December 1994 to November 1995 ("the third review period").

In December 1995, when Commerce published notice of the opportunity to request an administrative review for the dumping order for the third review period, Ta Chen requested a review. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 60 Fed.Reg. 62,070, 62,071 (Dep't Commerce Dec. 4, 1995). The third administrative review period, extending from December 1994 to November 1995, is at issue in this appeal. Ta Chen made no sales to Sun during this period. In fact, Ta Chen made no sales to Sun after August 1994; however, certain of Ta Chen's sales to Sun were included in the third review period because Ta Chen shipped merchandise to Sun in the United States during that time frame. *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 97–08–01344, slip op. 97–117, 1999 WL 1001194, at *2 n. 3 (Ct. Int'l Trade Oct. 28, 1999) ("*Ta Chen I* ").

In 1994, in proceedings pertaining to the first administrative review, the petitioners represented to Commerce that Ta Chen and Sun were potentially affiliated. *Ta Chen II*, at *3. Affiliation is significant because, although dumping margins are ordinarily calculated with respect to the difference in price between what a foreign exporter charges in its home market and the price it charges in the United States, § 1677(33) of Title 19 of the United States Code includes certain affiliates in the statutory definition of "exporter." The price at which such affiliates resell the merchandise in the United States constitutes the constructive export price, and is used to

calculate the exporter's dumping margin. *See* 19 U.S.C. § 1677a(a)—(b) (2000). Thus, if an exporter such as Ta Chen sells a product to an affiliate at an inflated price, the exporter will be held accountable for dumping if the affiliate charges less-than-fair-value upon resale.

For the first two review periods, the petitioners alleged affiliation. Ta Chen denied affiliation, and Commerce neither questioned Ta Chen regarding its affiliation with Sun nor requested Sun's resale data. During those first two review periods, Ta Chen owned no equity in Sun. Under Commerce's then-existing interpretation of the statute applicable at that time, a finding that a party was sufficiently affiliated with an exporter to warrant use of that party's sales price as the constructive export price required equity ownership. Consequently, (although Commerce later changed its position) under Commerce's interpretation of the relevant statute during the first two review periods, Ta Chen and Sun were not affiliated. *See Ta Chen Stainless Steel Pipe, Ltd., v. United States*, No. 99–07–00446, slip op. 01–143, 2001 WL 1574603, at *2–3 (CIT Dec. 10, 2001) (*"Ta Chen IV"*) (explaining that Commerce previously interpreted 19 U.S.C. § 1677(13) (1988) to require equity ownership for an affiliate relationship, and holding that Commerce was free to change its interpretation subject to the requirements that it explain the reason for its change in position and that its new position must be consistent with the statute); *see also Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 99–07–00446, slip op. 01–101, 2001 WL 915254, at *5–6 (CIT Aug. 14, 2001) (holding that although the previous statute permits examination of factors other than equity ownership, Commerce must explain the reason for its departure from past practice, which required equity ownership for affiliation, and remanding to provide Commerce an opportunity to explain the reason for its departure).

During the third period of review, the statute regarding affiliation changed. Congress enacted the Uruguay Round Agreements Act (URAA), which became effective on January 1, 1995, one month into the third review period. The URAA broadened the circumstances under which the dumping margins of exporters would be determined based upon the constructive export price of their United States affiliates. *See* 19 U.S.C. § 1677(33)(g) (2000) (providing that control is sufficient to render parties "affiliated," and that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person"). The scope of § 1677(33)(g) appears broader than the pre-URAA statute because control may exist without equity ownership; however, Commerce had interpreted the pre-URAA statute to require equity ownership even though that statutory language was also susceptible to a broader definition. Thus, when the URAA initially became effective one month into the third review period, Customs' interpretation of the meaning of "affiliated parties" had not yet been promulgated and it was as of yet unclear how the agency would interpret the new statutory standard.

Two and a half years after the URAA became effective, Commerce issued a final rule codifying the agency's interpretation of "control," sufficient to render an entity an "affiliated" under the URAA. *See* 19 C.F.R. § 351.102 (2000). Under Commerce's interpretation, as codified in § 351.102, "corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships," will not provide a basis for finding affiliation based on operational control, "unless the relationship has the potential to impact decisions concerning the production, pricing or cost of the subject merchandise." *Id.* This regulation did not be-

come effective until July 1, 1997, almost two years after the end of the third review period. *See Antidumping Duties; Countervailing Duties,* 62 Fed.Reg. 27,296, 27,417 (Dep't Commerce May 19, 1997) (final rules). For administrative reviews such as the third review period at issue, which were initiated after the URAA became effective but prior to the effective date of the rules, Commerce stated that the regulation would "serve as a restatement" of its interpretation of the requirements of the URAA.

Commerce determined that during the third review period, Sun met its new interpretation of an "affiliated person" under the URAA. But it was not until January 10, 1997, that Commerce informed Ta Chen of this determination. In fact, Commerce failed to inform Ta Chen that it considered Sun an affiliate during the third period of review, or that it might consider Sun an affiliate during the third period of review, until after Ta Chen's affiliation with Sun unquestionably ended.

On February 13, 1996, Commerce first issued Ta Chen a general questionnaire regarding affiliated importers. This questionnaire quoted the newly enacted statutory definition of "affiliated persons." It did not, however, offer additional guidance regarding Commerce's interpretation of the scope of this statutory standard, nor did the questionnaire refer to Sun. Ta Chen's response listed other companies as affiliates, but did not include Sun.

On October 22, 1996, Commerce first requested information about Sun, in particular. Commerce issued a supplemental questionnaire requesting that Ta Chen "[p]lease explain in detail your relationship, past and present, with all entities known as [Sun]." The panel majority states that in response to this questionnaire, Ta Chen "did not provide any information regarding sales data." *Ante* at 1333. This statement implies that Commerce's supple-

mental questionnaire requested Sun's sales data. That implication is clearly erroneous. The supplemental questionnaire made no such request. Indeed, as the Court of International Trade noted, Commerce "never specifically requested this [sales] information," prior to its first attempt to impose adverse facts against Ta Chen. *Ta Chen I* at *12.

Moreover, after receiving Ta Chen's response to the first supplemental questionnaire, Commerce apparently issued a second supplemental questionnaire on December 24, 1996. *Id.* at *12. The CIT found that in this second supplemental questionnaire, Commerce "specifically told Ta Chen ... that it had not yet decided how to classify Ta Chen's U.S. sales." *Id.* Commerce failed to ask specifically for Sun's U.S. sales data in this questionnaire, despite issuing preliminary results two weeks later, on January 10, 1997, in which Commerce determined that Sun was an affiliate.

Commerce issued both supplemental questionnaires after the deadline for Ta Chen to submit unsolicited factual information. *Id.* Commerce failed, in either questionnaire, specifically to request Sun's sales data. In fact, the CIT stated that Commerce "appears to have tried to avoid giving Ta Chen a belated chance to amend." *Id.* Because Commerce failed to notify Ta Chen that the agency considered Sun an affiliate, the CIT reversed Commerce's imposition of adverse facts and remanded the matter to give Ta Chen "an opportunity to remedy or explain the deficiency" pursuant to 19 U.S.C. § 1677m(d). *Ta Chen I* at *12–14 (stating that "Commerce has an obligation to make the questions affected by affiliation issues clear, in light of its own recognition that affiliation is a complex concept").

Thus, Commerce did not make clear to Ta Chen from the outset of the third ad-

ministrative review that it considered Sun an affiliate, or even a potential affiliate, under the new statutory and regulatory definition. Although I agree with the panel majority and the CIT that substantial evidence supports Commerce's determination that Sun and Ta Chen were affiliated within the meaning of § 1677(33)(G) for the early part of the third review period, I do not agree that any statutory or regulatory authority authorizes the imposition of an adverse inference against Ta Chen for Ta Chen's failure to predict that Commerce would reach this determination. *See Ta Chen I* at *14 ("In this case Ta Chen had a good basis to argue that it did not control Sun and it made that argument to Commerce."). For the first seven months of the third review period, from December 1994 to July 1995, a *former* minority shareholder of Ta Chen, Frank McClane, owned Sun. During this time, Ta Chen had custody of Sun's signature stamp, and access to its accounts receivable and payable, inventory, and pricing information. . Ta Chen also participated in negotiations of Sun's sales of steel pipe during this time. From this, a reasonable fact-finder could infer that Ta Chen exercised influence sufficient to constitute "control" over Sun's U.S. pricing.

Had Commerce requested Sun's sales data from Ta Chen during this period of affiliation, Ta Chen would have had to produce it or suffer the imposition of an adverse inference. . It is unreasonable, however, to assume that if an affiliation exists at one time, it necessarily continues indefinitely. *Cf. AK Steel Corp. v. United States,* 192 F.3d 1367, 1376 (Fed.Cir.1999) (reversing imposition of countervailing duties because although Korean government exercised the requisite control to benefit its steel industry at one time, "Commerce has not pointed to evidence from which it is reasonable to infer that the government's control continued into the period of investigation"). In this case,

the affiliation ended. It ended before Commerce ever requested Sun's resale data from Ta Chen.

On July 3, 1995, with almost six months remaining in the third period of review, McClane sold a controlling interest in Sun to a foreign corporation, Picol International ("Picol"). *Ta Chen II* at *1. Commerce did not publish a notice of initiation for review in this case until February 1, 1996, almost seven months after Sun was sold and its affiliation with Ta Chen was severed. *See Ta Chen I* at *12. After Commerce issued the initial questionnaire and the two supplemental questionnaires described above—none of which specifically requested Sun's sales information despite the new but potentially inapplicable statutory definition of affiliates—Commerce issued preliminary results for the third review period in which it determined that Sun and Ta Chen were affiliated. Commerce then determined that Ta Chen had failed to act to the best of its ability to provide information on Sun's U.S. sales, and imposed the highest dumping margin from facts otherwise available for those sales.

Ta Chen appealed. On appeal, the CIT affirmed the finding of affiliation. *Ta Chen I* at *11 ("The court finds that Commerce's determination that Ta Chen controlled Sun is supported by substantial evidence."). The court remanded, however, because it found that Commerce erred in imposing adverse facts without providing adequate notice that Commerce would classify Ta Chen's sales to Sun as constructive export price sales. *Id.* at 12. According to the court, Commerce failed to satisfy its "statutory obligation to provide respondents with a chance to remedy deficient submissions," *id.* (citing 19 U.S.C. § 1677m(d) (1994)), because Commerce never specifically requested Sun's resale data, and, by the time Ta Chen learned

that Commerce would classify Ta Chen and Sun as affiliates, the time to submit unsolicited information had passed, *id.* The court explained that:

> [I]f a respondent reasonably believes it is not affiliated with its reseller ... then it has a reason not to submit information on the subject reseller's U.S. sales until Commerce tells the respondent that it wants the information on the particular reseller or until Commerce's questions are clear enough that the respondent knows what it should submit. In this situation where a new statute was not fully explained and Commerce suspected that it would make a finding of affiliation between the importer and the U.S. reseller, it should have placed the respondent on notice, specifically requested information on that reseller's U.S. sales, and requested any other information necessary to the [constructive export price] calculation. If Commerce wishes to place the full burden of error of an affiliation assessment on the respondent, at a minimum it must make that clear, otherwise this is simply another instance of error which respondents must have an opportunity to correct under 19 U.S.C. § 1677m(d).

*Id.* at *14.

On remand, Commerce specifically requested Sun's resale data for the first time. This request occurred on November 9, 1999, more than four years after the former minority shareholder in Ta Chen had sold Sun to Picol. Ta Chen forwarded Commerce's request for Sun's sales data to Picol, but Picol declined to provide Sun's sales data. In a letter dated November 25, 1999, Picol's attorney stated that "Sun was closed on September 30, 1998" and no longer conducted business in the United States. The letter stated that because answering Commerce requests is burdensome and costly, his client would not cooperate with Commerce's inquiry. Ta Chen requested that Picol reconsider answering

Commerce's request, and submitted a response to Commerce explaining that Sun had undergone a subsequent buyout after McClane sold it in 1995 and requesting an extension "in the hope that we hear back a more positive response from Sun." Commerce granted Ta Chen two extensions of time. On December 8, 1999, the day after Commerce granted the second extension, Ta Chen forwarded Commerce a second letter from Picol's attorney. That letter states: "My client advises me today that he will not respond to the [Commerce] questionnaire for the same reason as I indicated to you in my prior letter dated November 25, 1999." At that point, Ta Chen informed Commerce that "further pressing on this matter appears to be futile."

Commerce concluded that Ta Chen had failed to comply to the best of its ability in providing the requested Sun sales data because Ta Chen failed to provide the data itself. Commerce did not inform Ta Chen of any insufficiency in the efforts Ta Chen made to comply with the request after receiving it. Rather, Commerce concluded that Ta Chen should have "taken steps to obtain and preserve the relevant records" *before Commerce requested them. Certain Welded Stainless Steel Pipe from Taiwan, Final Results of Redetermination Pursuant to Court Remand,* No. 97–08–01344, slip op. 99–117 at 4 (Dep't Commerce Feb. 25, 2000) (*"Remand Results"*). Commerce concluded that Ta Chen should have taken these affirmative steps in anticipation of a potential future request because "Ta Chen had notice that its relationship with Sun in particular, raised a question with the Department as to affiliation at least as early as October 1996." *Id.* at 9.

Commerce's determination was contrary to law. By October 1996—the date on which the agency reasoned that Ta Chen had notice that it should preserve Sun's

sales information—Sun had already been sold to Picol. The record is devoid of evidence to support an inference that Sun and Ta Chen were affiliated after that sale. Nor does it contain evidence suggesting that Ta Chen had any access to Sun's resale data in October 1996, or in November 1999 when Commerce first specifically requested it. Nevertheless, on remand, Commerce imposed adverse facts against Ta Chen in calculating the applicable dumping margin.

Ta Chen appealed to the CIT for the second time. This time, the court affirmed Commerce's determination in its entirety. *See generally Ta Chen II*. In the prior appeal, the CIT held that Commerce acted contrary to law by failing to notify Ta Chen that it was accountable for producing Sun's resale data. This time, however, the court held that Ta Chen could be held accountable for failing to produce the data because "[a]s early as July 1994, Ta Chen knew its relationship with Sun was at issue because the petitioners had called it to the Department's attention in the first administrative review." *Ta Chen II* at *3. Therefore, the CIT affirmed Commerce's determination that Ta Chen failed to act to the best of its ability in responding to Commerce's information request, not because of any insufficiency in Ta Chen's response to the request once it issued, but because "in order to comply to the best of its ability, Ta Chen should have *preserved* Sun's information in the event that its sales were classified as [constructive export price sales]." *Id.* (emphasis added).

The CIT reached this conclusion despite a complete lack of evidence suggesting that Ta Chen ever possessed that information to begin with. Commerce appears to have recognized this; it held that Ta Chen's efforts were deficient because Ta Chen failed to "*obtain* and preserve" Sun's sales data. *Remand Results* at 4 (emphasis added). Thus, the CIT affirmed Commerce's determination only by diverging from the crucial facts as Commerce found them, in violation of *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Next, despite concluding in the previous appeal that Commerce erred in failing to follow its statutory mandate to provide Ta Chen with the chance to remedy deficiencies in its response, this time the CIT determined that Commerce was under no obligation to afford Ta Chen a chance to remedy the deficiency. *Ta Chen II* at *5. The court held that Commerce need not provide Ta Chen with the chance to remedy the deficiency in its response. This is so, it concluded, because § 1677m(d) is inapplicable in remand proceedings "where time is of the essence," and because the chance to remedy errors would have made no difference; part of Ta Chen's deficiency was that it "could have done more to preserve the information on Sun's U.S. sales when it clearly had control of the information." *Id.*

The CIT erred in affirming Commerce's determination, as does the panel majority. Commerce's imposition of adverse facts was contrary to law. The CIT reached a contrary conclusion by impermissibly reading the applicable statutes. It issued a decision that contravenes both the law and the reasoning by which the court was guided in *Ta Chen I*. Consequently, on appeal, this court should have reversed and remanded. But rather than analyzing the pertinent statutory language to determine whether Commerce acted within the bounds of its statutory authority—which it did not—the panel majority skips the technicalities of statutory interpretation, and affirms on the basis that "it is reasonable in this case for Commerce to expect Ta Chen to preserve its records in the event that Commerce itself would request

them...." *Ante* at 1336. Grave error infects this determination at every turn.

The majority begins by noting that Commerce imposed adverse facts against Ta Chen because "Ta Chen was affiliated with Sun during the period of review and then *subsequently* failed to act to the best of its ability to provide information on Sun's U.S. sales." *Ante* at 1336 (emphasis added). But as we shall see, the record contains no evidence of any failure on the part of Ta Chen subsequent to the period of review. It certainly contains no evidence of any failure on the part of Ta Chen *subsequent* to Commerce's request for Sun's resale data. To the contrary, the majority's conclusion necessarily rests on the assumption that Ta Chen should have obtained and preserved Sun's resale data *before* Sun was sold. The sale to Picol occurred on July 3, 1995, *six months* before the end of the period of review, more than *one year* before Commerce determined that Ta Chen was on notice that it *might* request Sun's resale data, and more than *four years* before any evidence of record reflects a specific request by Commerce for this data. There is no statutory basis for imposing on Ta Chen a duty to obtain and preserve records prior to a request for information by Commerce.

Next, the majority determines that "Ta Chen bore the burden of creating an accurate record." *Ante* at 1336. In support of this proposition, the majority cites *Zenith Electronics Corp. v. United States,* 988 F.2d 1573, 1583 (Fed.Cir.1993), in which this court stated that the burden of production rests on "the party *in possession* of the necessary information." (Emphasis added.). But no evidence of record demonstrates that Ta Chen ever possessed Sun's U.S. resale data. Although Ta Chen could have been held accountable for obtaining that information from Sun during the period of affiliation, it is that period and that period alone during which the notion of constructive possession could reasonably apply. The law simply does not require companies to succeed in obtaining information from non-affiliates, over which, by statutory definition, they lack control. For non-affiliates, exporters' best efforts may fall short of obtaining cooperation.

Commerce therefore erred in concluding that "the requested data relates to a period when Ta Chen and Sun were readily sharing the subject information.... In this situation, it is reasonable to expect Ta Chen to work with Sun's new owners to obtain the new information." *Remand Results,* at 11. To the contrary, although the evidence of affiliation is sufficient to demonstrate that Ta Chen *could have* obtained Sun's sales records during at least part of the third review period, the record is devoid of evidence suggesting that Ta Chen actually did so. Unless Commerce can demonstrate that Ta Chen was affiliated with Sun *after* Commerce requested Sun's sales information, then Commerce is free to expect Ta Chen to attempt to obtain the information from Sun's new owners, but Commerce is not free to impose adverse facts against Ta Chen if Sun's new owners refuse to cooperate. Rather, Commerce must identify any deficiencies in Ta Chen's efforts to persuade Sun to cooperate. The agency must also afford Ta Chen the chance to remedy such deficiencies before it may impose adverse facts available.

Finally, despite noting that "a respondent to a Commerce inquiry only has an obligation to produce data requested by Commerce," *ante* at 1336 (citing § 1677e(b)), the panel majority concludes that "it is reasonable in this case for Commerce to expect Ta Chen to preserve *its* records in the event that Commerce itself would request them, which it actually did in October 1996," *id.* (emphasis added). But it is *Sun's* records, not Ta Chen's, that Ta Chen is being faulted for not producing.

I disagree that it is reasonable for Commerce to expect Ta Chen to obtain and preserve Sun's records. For six months during 1995 Ta Chen and Sun *arguably* met a newly adopted statutory definition of affiliation. Commerce did not clarify its interpretation of this admittedly complex statutory provision until issuing final rules in 1997. Although the petitioners had alleged that Ta Chen and Sun were affiliated during earlier review periods, Commerce failed to question Ta Chen about the potential affiliation. In fact, in the second supplemental questionnaire issued by Commerce two weeks before it initially determined that Sun's resale price would constitute Ta Chen's constructive export price, Commerce informed Ta Chen that the agency had not yet determined how it would classify Ta Chen's sales. As between Ta Chen and Commerce, it is reasonable to place the burden on Commerce to inform Ta Chen that its interpretation of impending legislation may lead it to request information that it had previously not requested.

Reason does not, it seems to me, support the majority's decision to affirm Commerce's imposition of the requirement that Ta Chen actively obtain and preserve records in response to a request that Commerce might (or might not) someday make. This is particularly so where, in response to the petitioners' allegations in 1994 and the enactment of the URAA, Commerce easily could have made clear that it might consider Sun an affiliate, and that Ta Chen should therefore take steps to obtain and preserve Sun's sales data.

More importantly, even were such an expectation reasonable, there is simply no statutory authority allowing Commerce to assume adverse facts against an importer for failing to predict what information Commerce might someday request. *See FAG Italia, S.p.A.*, 291 F.3d at 816–19 (holding the absence of a statutory prohibi-

tion cannot be a source of agency authority and that Commerce lacks authority to conduct two and four-year duty absorption inquiries for transition orders due to the absence of statutory authorization). The statute on which Commerce relied, § 1677e(b), requires importers to respond to requests by Commerce to the best of their abilities. Commerce may impose adverse facts only where a party fails to "cooperate by not acting to the best of its ability to comply with a *request for information*" from Commerce. 19 U.S.C. § 1677e(b) (2000) (emphasis added). The statute does not require importers to take active measures to acquire or preserve information prior to such a request. Nor does the statute authorize Commerce to impose adverse facts based upon the consequences of legitimate business transactions that occur prior to a request. In this case, until Commerce notified Ta Chen that it might deem Sun an affiliate and requested that Ta Chen obtain and provide Sun's sales data, Ta Chen had no obligation to obtain and preserve that information.

Moreover, the rationale for the statute is "to provide respondents with an incentive to cooperate." *F.LLI DeCecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed.Cir.2000). This purpose is not served by allowing Commerce to impose adverse facts available based on an exporter's failure to preserve information that has become unavailable by the time Commerce requests it. One cannot fail to comply with a non-existent request. The existence of § 1677m(d), which affords respondents a chance to remedy deficiencies in their responses, also confirms the interpretation that the duty to respond with best efforts to a request made pursuant to § 1677e(b) arises *in response* to requests by Commerce, not prior to them.

Finally, Commerce violated § 1677m(d) by failing to notify Ta Chen of the nature of the deficiency in its response to the request for Sun's resale data. Although Ta Chen responded to Commerce's request by informing Commerce of Ta Chen's attempts to obtain Sun's records from Picol, Commerce concluded that Ta Chen had failed to use its best efforts in response to Commerce's request for Sun's resale data, and therefore determined that it would impose adverse facts against Ta Chen without promptly informing Ta Chen "of the nature of the deficiency," and without providing Ta Chen with "an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d) (2000).

Contrary to the Court of Internal Trade's conclusion, nothing in the text of § 1677m(d) precludes it from applying in the context of remand proceedings. Remand occurs when some aspect of an antidumping determination by Commerce has been inadequate. It would be strange indeed if Congress had intended to authorize the CIT to remand a determination for failure to comply with § 1677m(d), only to have Commerce fail to comply again, but escape the consequences of so doing because the failure occurred on remand. Had Congress meant to exclude application of § 1677m(d) from remand proceedings, it simply would have said so.

In fact, the panel majority does not even address this aspect of the CIT's determination. I interpret the opinion, therefore, as holding § 1677m(d) inapplicable on the facts of this case, not in remand proceedings generally. The conclusion that Commerce satisfied the requirements of § 1677m(d) because Ta Chen provided no "response to a request" but rather engaged in a "complete failure to respond" is belied by the majority's recognition that Ta Chen responded to Commerce's request by, among other things, informing

Commerce that further efforts to obtain the information from Picol would be futile.

The evidence of record indicates that Ta Chen attempted to comply with Commerce's request to provide Sun's resale data once Commerce made that request. Commerce is not authorized to hold Ta Chen accountable for failing to predict and take affirmative steps to execute that request, which came over three years after the alleged affiliation between Ta Chen and Sun ended. Commerce is authorized to require Ta Chen to respond to the best of its *present* ability with a request. Commerce lacks authority to deem a response deficient based on the notion that Ta Chen should have affirmatively acted to "obtain and preserve" another company's records before Commerce requested them.

In short, the Court of International Trade got it right in *Ta Chen I*:

> If Commerce wishes to place the full burden of error of an affiliation assessment on the respondent, at a minimum it must make that clear, otherwise this is simply another instance of error which respondents must have an opportunity to correct under 19 U.S.C. § 1677m(d).

*Ta Chen I*, at *14. If Commerce wishes to require all importers to take active steps to obtain sales records of any U.S. distributors who may later be deemed affiliates, it must promulgate a regulation pursuant to statutory authority. Having failed to do so, Commerce may not automatically hold Ta Chen accountable for failing to obtain records of another company with which it was formerly affiliated. It must assess Ta Chen's efforts in light of the relationship in existence once Commerce made its request.

The imposition of adverse facts and the resulting dumping margin should be vacated and remanded. On remand, Commerce should be instructed to comply with § 1677m(d) by explaining to Ta Chen what

additional efforts Commerce expects Ta Chen to take to obtain its former affiliate's records. The panel majority's decision instead to affirm gives Commerce carte blanche to require importers to gaze into their crystal balls, and to affirmatively obtain records that Commerce may never request, or may request years later under a subsequent change in the law. Imposing this requirement is both unreasonable and, more importantly, contrary to law. I therefore respectfully dissent.