# United States Court of Appeals for the Federal Circuit

---

**CHANGZHOU WUJIN FINE CHEMICAL FACTORY CO., LTD.,**
*Plaintiff,*

AND

**JIANGSU JIANGHAI CHEMICAL GROUP, LTD.,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

AND

**COMPASS CHEMICAL INTERNATIONAL, LLC,**
*Defendant-Appellee.*

---

2011-1080

---

Appeal from the United States Court of International Trade in case no. 09-CV-0216, Judge Judith M. Barzilay.

---

Decided: December 17, 2012

---

DAVID J. CRAVEN, Riggle and Craven, of Chicago, Illinois, argued for plaintiff-appellant.

ANTONIA R. SOARES, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and PATRICIA M. MCCARTHY, Assistant Director. Of counsel on the brief was AHRAN KANG MCCLOSKEY, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

JEFFREY S. LEVIN, Mondial Trade Compliance Services & Solutions Inc., of Bethesda, Maryland, argued for defendant-appellee Compass Chemical International, LLC.

———————————————

Before DYK, CLEVENGER, and REYNA, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* DYK. Dissenting opinion filed by *Circuit Judge* REYNA.

DYK, *Circuit Judge.*

Jiangsu Jianghai Chemical Group, Ltd. ("Jiangsu Jianghai") appeals a decision of the United States Court of International Trade that the Department of Commerce ("Commerce") did not exceed the scope of a remand order when it recalculated the U.S. price and that the explanation given by Commerce for its calculation of the separate rate on remand was not unreasonable. We affirm in part, and reverse and remand in part.

BACKGROUND

When merchandise is sold in the United States at less than fair value, Commerce is authorized by statute to

impose antidumping duties. These duties are equal to the amount by which the price of the merchandise in the exporting country ("normal value") exceeds the price of the merchandise in the United States ("export price" or "U.S. price."). *See* 19 U.S.C. §§ 1673e(a)(1), 1677b(a)(1), 1677a(a). The statute provides that Commerce will generally determine individual dumping margins for each known exporter or producer, but if that is not practicable, Commerce may individually investigate a reasonable number of respondents. 19 U.S.C. § 1677f-1(c)(1)–(2). Those not individually investigated are assigned a separate rate, sometimes referred to as the "all-others" rate. 19 U.S.C. § 1673d(c)(1)(B)(II). In proceedings involving non-market economy countries, including China, Commerce presumes that exporters and producers are state-controlled, and assigns them a single state-wide rate. *See* 19 C.F.R. § 351.107. This presumption is rebuttable; a company that demonstrates sufficient independence from state control may apply to Commerce for a separate rate. Here, Commerce concluded that the appellant was entitled to a separate rate. The central issue concerns the calculation of that separate rate.

This underlying proceeding involves an investigation of imports of 1-hydroxyethylidene-1,1-diphosphonic acid ("HEDP") from the People's Republic of China, initiated in response to a petition filed by Compass Chemical International, LLC ("Compass Chemical"). Commerce sent initial quantity and value ("Q&V") questionnaires to ten known HEDP exporters and producers identified in the petition. *1 Hydroxyethylidene 1,1 Diphosphonic Acid from the Republic of India and the People's Republic of China*, 73 Fed. Reg. 62,470 n.1 (Dep't of Commerce Oct. 21, 2008) ("Preliminary Determination"). Five companies responded: Changzhou Wujin Fine Chemical Factory Co., Ltd. ("Wujin Fine Chemical"); Changzhou Kewei Fine

Chemical Factory ("Kewei"); BWA Water Additives U.S. LLC ("BWA"); Nanjing University of Chemical Technology Changzhou Wujin Water Quality Stabilizer Factory Ltd. ("Wujin Water"); and Jiangsu Jianghai. Because Jiangsu Jianghai was not one of the ten companies identified in the petition, Commerce did not send it an initial Q&V questionnaire; thus, its response was voluntary.

The questionnaire responses indicated that BWA was one of the largest exporters of HEDP from China to the U.S. during the period of investigation. However, Commerce did not select BWA as a mandatory respondent because BWA refused to permit public disclosure of its supplier, and was therefore ineligible to be individually investigated. Commerce instead selected Wujin Water and Kewei as the mandatory respondents. Kewei subsequently notified Commerce that it would no longer participate in the investigation, leaving Wujin Water as the only cooperating mandatory respondent. Wujin Water, Wujin Fine Chemical, and Jiangsu Jianghai all responded to Commerce's supplemental questionnaires, and Jiangsu Jianghai and Wujin Fine Chemical requested that Commerce assign them separate, company-specific rates. Because it refused to supply the necessary information, BWA was ineligible to apply for a separate, company-specific rate.

On October 21, 2008, Commerce published a preliminary determination that HEDP from China was, or was likely to be, sold in the United States at less than fair value, and assigned antidumping rates to Chinese producers of HEDP.[1]  Preliminary Determination 1.  Cooper-

---

[1]  On May 16, 2008, the United States International Trade Commission had published an affirmative preliminary determination that imports of Chinese HEDP were likely to materially injure domestic industry.

ating mandatory respondent Wujin Water received a preliminary rate of 24.30%, based on the data it had submitted to Commerce. *Id.* When Commerce determines that a respondent has not cooperated to the best of its ability in supplying Commerce with requested information, Commerce may subject that respondent to "adverse facts available" ("AFA") and employ an inference adverse to the respondent's interests when selecting among the facts available to determine its rate. *See* 19 U.S.C. § 1677e(b). Applying AFA, Commerce assigned a preliminary rate of 72.42% to non-cooperating mandatory respondent Kewei. Kewei's AFA rate reflected the amount by which the petition's alleged normal value exceeded the petition's alleged export price. As required by section 1677e(c), Commerce corroborated Kewei's AFA rate using data submitted by Wujin Water.[2] Because

---

*1-Hydroxyethylidene-1, 1-Diphosphonic Acid (HEDP) from China and India*, 73 Fed. Reg. 28,507 (Int'l Trade Comm'n May 16, 2008).

[2] Commerce corroborated the AFA rate because it was based on information from the petition, rather than information obtained during the investigation. Specifically, section 1677e(c) requires that:

> When the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

19 U.S.C. § 1677e(c). Commerce "ha[s] interpreted 'corroborate' to mean that [Commerce] will, to the extent practicable, examine the reliability and relevance of the information submitted." *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China*, 74

Kewei had not demonstrated its independence from state control, Commerce treated Kewei as part of a "China-wide entity"; therefore, all Chinese exporters and producers that did not qualify for separate rates were likewise assigned the 72.42% rate.

Turning to Jiangsu Jianghai and Wujin Fine Chemical, Commerce determined that they had provided sufficient evidence of their independence from state control and qualified for a separate, company-specific rate. For preliminary purposes, Commerce assigned them "a weighted-average margin based on the experience of mandatory respondents and excluding any *de minimis* or zero rates or rates based on [AFA]". 73 Fed. Reg. at 62,473; *see also* 19 U.S.C. § 1673d(c)(5)(A). Because the AFA rate assigned to mandatory respondent Kewei was excluded from this calculation, Jiangsu Jianghai and Wujin Fine Chemical were assigned cooperating mandatory respondent Wujin Water's preliminary rate of 24.30%. *Id.*

Wujin Water provided Commerce with its final data submission in December of 2008. As a result, Commerce reduced Wujin Water's margin from 24.30% to *de minimis*. *1-Hydroxyethylidene-1,1-Diphosphonic Acid from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 10,545 (Dep't of Commerce Mar. 11, 2009). Commerce continued to apply the single antidumping rate of 72.42% to all other Chinese exporters and producers, with the exception of Wujin Fine Chemical and Jiangsu Jianghai, which continued to qualify for a separate rate.

---

Fed. Reg. 10,545, 10,547 (Dep't of Commerce Mar. 11, 2009).

Under the trade statute, the separate rate for separate rate respondents like Wujin Fine Chemical and Jiangsu Jianghai is normally "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely [on the basis of AFA]." 19 U.S.C. § 1673d(c)(5)(A). Commerce determined that it was no longer appropriate to assign Wujin Water's rate to the separate rate applicants, because that rate had been reduced to *de minimis*. Commerce looked to section 1673d(c)(5)(B), which provides that when the margins established for all individually investigated respondents are zero, *de minimis*, or based entirely on AFA, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." *Id.* Commerce explained that

> because there are no rates other than *de minimis* [i.e., Wujin Water's] or those based on AFA [i.e., Kewei's], we have determined to take a simple average of the AFA and the *de minimis* rate calculated for Wujin Water as a reasonable method for purposes of determining the rate assigned to Wujin Fine Chemical and Jiangsu Jianghai.

74 Fed. Reg. at 10,546. Consequently, Wujin Fine Chemical and Jiangsu Jianghai were assigned a rate of 36.21%, representing a simple average of Kewei's 72.42% rate and Wujin Water's *de minimis* rate. *Id.* at 10,547.

On June 25, 2009, Jiangsu Jianghai and Wujin Fine Chemical filed an action in the Court of International Trade, in which they challenged Commerce's corroboration of the AFA rate used to calculate their separate rate, as well as the financial ratios and surrogate values used to calculate the AFA rate.  They argued, inter alia, that using a flawed AFA rate in calculating a separate rate "would, in essence, punish a fully cooperative respondent and apply adverse inferences in the absence of any finding of a lack of cooperation."  Mot. J. Agency R. at 16, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade Sept. 21, 2009), ECF No. 25. The court granted the government's request for a partial voluntary remand, and issued an order authorizing Commerce

> to reconsider the separate rate amount after examining the following issues []: (i) whether Commerce corroborated the [AFA] rate upon which it relied in calculating the separate rate and (ii) whether Commerce used the proper financial ratios and the proper surrogate value for Phosphorus Trichloride and steam in calculating the [AFA] rate Commerce used as a basis for the separate rate.

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216, 2010 Ct. Intl. Trade LEXIS 108, at *1 (Feb. 8, 2010)  ("Remand Order").  The court retained jurisdiction pending the remand.  *Id.* at *2.

On remand, Commerce abandoned the AFA rate based on the petition, because it found that Wujin Water's

data could no longer corroborate that rate.[3]  *See* Final Results of Redetermination Pursuant to Court Order at 5, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade May 3, 2010), ECF No. 44  ("Final Remand Redetermination").  As a preliminary step in recalculating the separate rate, Commerce calculated a new, hypothetical AFA rate of 30.94%, which it based on Wujin Water's verified normal value data and unverified U.S. price data obtained from the non-cooperating respondent BWA.  Commerce did not assign this hypothetical AFA rate to any party; rather, it was used solely as the predicate for calculating the new separate rate for Wujin Fine Chemical and Jiangsu Jianghai.  Commerce determined that because the hypothetical AFA rate was based on information obtained during the course of the investigation, corroboration was unnecessary.  Averaging the hypothetical AFA rate of 30.94% with Wujin Water's *de minimis* rate, Commerce obtained a separate rate of 15.47%, which it assigned to Wujin Fine Chemical and Jiangsu Jianghai.[4]

In their comments to Commerce on its draft remand results, Wujin Fine Chemical and Jiangsu Jianghai argued that Commerce should not base the hypothetical AFA rate on BWA's data.  *See* Comments on Draft Remand Determination by Wujin Fine Chemical & Jiangsu Jianghai at 6-8, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade Mar. 31,

---

[3]  While some of Wujin Water's figures remained relatively constant between the preliminary determination and the final determination, other figures changed, apparently due to adjustments in Commerce's methodology.

[4]  Because Commerce no longer relied on the disputed financial ratios and surrogate values, it did not address the second part of the court's remand order.

2010), ECF No. 47-5. In the Final Remand Redetermination, Commerce stated that any other data—including the mandatory respondents' data, or an average of BWA's data with those of any other respondent—would produce a hypothetical AFA rate of zero. According to Commerce, this would be unacceptable, because

> [a]n AFA rate of zero would not be sufficiently adverse as to effectuate the purpose of the facts available rule to induce respondents to provide the Department with complete and accurate information in a timely manner and would not ensure that uncooperative parties do not obtain a more favorable result by failing to cooperate than if they had cooperated fully.

Final Remand Redetermination 16.

Following the Final Remand Redetermination, the Court of International Trade considered the parties' comments on the remand results. The appellant objected that Commerce's deterrence rationale was inappropriate under the circumstances:

> The ultimate objective in this case is to calculate a margin for the Plaintiffs using a reasonable method. The most appropriate, if not the only appropriate method, is to use the Q&V [data] of the [cooperating] plaintiffs . . . . The Department rejected the use of this data alleging that it would result in an AFA rate which would be zero and that a rate of zero would not act as a deterrent. Plaintiffs note that the new 'AFA' rate would not be used for any purpose other than assigning a rate to [cooperating separate rate applicants]. . . . [A]s discussed above, deterrence is not the only

factor involved in calculating an AFA rate, and deterrence is never a factor in calculating a non-AFA rate.

Pls.' Comments on Remand Determination 12-13, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade June 4, 2010), ECF No. 48 ("Pls.' Comments on Remand").

The Court of International Trade affirmed Commerce's remand results. *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216, 2010 Ct. Intl. Trade LEXIS 96, at *15 (Aug. 5, 2010). The court rejected the appellant's contention that Commerce exceeded the scope of the remand order by recalculating the U.S. price, concluding that Commerce properly used other sources of U.S. price data when it determined that it could not corroborate its initial AFA rate on remand. The court found that the separate rate recalculation was supported by substantial evidence and was reasonable in view of Commerce's well-established methodologies. It rejected the contention that BWA's data failed to reflect commercial reality as required by *Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010), observing that because BWA had a large market share, its data substantially reflected the HEDP market. The court likewise considered and rejected the appellant's argument that Commerce "erroneously chose BWA's data solely to obtain a positive separate rate and, instead, should have used data from another uncooperative respondent." *Changzhou*, 2010 Ct. Int'l. Trade LEXIS 96, at *11.

After the Court of International Trade denied Jiangsu Jianghai and Wujin Fine Chemical's motions for reconsideration, *Changzhou Wujin Fine Chem. Factory Co. v.*

*United States*, No. 09-CV-0216, 2010 Ct. Intl. Trade LEXIS 106, at \*4 (Sept. 13, 2010), this appeal followed.[5] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

This appeal presents the following issues: (1) whether the Court of International Trade has jurisdiction to review Commerce's post-remand modification of U.S. price; and (2) whether Commerce acted arbitrarily when recalculating the separate rate assigned to appellant Jiangsu Jianghai, a cooperative respondent.

This court reviews decisions of the Court of International Trade concerning Commerce's antidumping determinations by applying the same standard of review used by the trade court. *Gallant Ocean*, 602 F.3d at 1323 (citing *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004)). In essence, Commerce's determination will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see F. Lli de Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000). Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g.*, *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("We review Commerce's decision under the Administrative Procedure Act and any other applicable law.").

---

[5]   Wujin Fine Chemical is not a party to this appeal.

I

We must first decide whether Commerce's recalculation of U.S. price was within the scope of the Court of International Trade's remand order.

We generally disfavor limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue. *See Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1038-39 (Fed. Cir. 2003) ("By sharply limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results."). So too, an appellant "faces a very high hurdle when it tries to convince us that, despite the remanding Court's satisfaction, we must conclude that the ITC on remand acted outside the scope of the remand directions." *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 814 (Fed. Cir. 1992).

The appellant argues that the voluntary remand order was limited in scope, only permitting Commerce to reconsider the normal value and the impact the surrogate values and financial ratios had on the AFA rate. According to the appellant, the remand order placed only two issues before Commerce: "whether Commerce corroborated the adverse facts available rate upon which it relied in calculating the separate rate," and whether Commerce used the proper financial ratios and surrogate values. Remand Order 1-2. The appellant argues that "[t]he first of these issues is clearly inapplicable to the U.S. price as it merely goes to the test of the selected final rate," Appellant's Br. 17, while the second issue relates to calculation of the normal value, not U.S. price. Because the remand order required only corroboration of the normal value and

no party challenged the U.S. price, the appellant concludes, Commerce had no authority to recalculate U.S. price.

We agree with Commerce that recalculating the U.S. price was within the scope of the voluntary Remand Order. Nothing in the remand order limited Commerce to recalculating the normal value when "examining . . . whether [it] corroborated the adverse facts available rate upon which it relied in calculating the separate rate." *See* Remand Order 1-2. Commerce specifically requested the partial voluntary remand "to examine the issues related to the adverse facts available rate, to make any necessary recalculations based on its examination, and to obtain comments from the parties." Def's. Resp. to Mot. for J. on the Admin. R. at 2, 23, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade Jan. 26, 2010), ECF No. 36.

Commerce's reexamination of the AFA rate used in calculating the appellant's separate rate necessarily involved reconsideration of the underlying variables, i.e., normal value and U.S. price. *See* 19 U.S.C. § 1673e(a)(1). Once Commerce determined that it could not corroborate Kewei's AFA rate as required by statute, *see* 19 U.S.C. § 1677e(c), Commerce reasonably chose to abandon the secondary information it originally used for normal value and U.S. price. We reject the appellant's argument that the remand order's second instruction to Commerce, regarding the proper financial ratios and surrogate values, limited Commerce to reconsideration of the normal value only. We conclude that Commerce acted within the remand order's broad scope when it decided to select a new U.S. price for purposes of calculating the appellant's new separate rate.

## II

The second question is whether Commerce acted arbitrarily in recalculating the appellant's separate rate, when Commerce constructed a hypothetical AFA rate based on U.S. price data obtained from a non-cooperating respondent, averaged that hypothetical AFA rate with the *de minimis* rate for Wujin Water, and then assigned the resulting separate rate to the appellant. The hypothetical AFA rate Commerce generated on remand was an "AFA rate" in name only: its sole purpose was to serve as a value in the recalculation of the separate rate. The hypothetical AFA rate was not assigned to any individually investigated entity, and only affected cooperating respondents.[6]

The applicable statute contemplates that the separate rate will generally be calculated by taking a weighted average of dumping margins assigned to individually investigated entities, excluding those margins that are zero, *de minimis*, or determined entirely on the basis of AFA. 19 U.S.C. § 1673d(c)(5)(A). Where, as here, the dumping margins for all individually investigated entities are zero, *de minimis*, or determined entirely on the basis of AFA, Commerce "may use *any reasonable method* to

---

[6] Commerce's Final Remand Redetermination stated that "BWA's data was used to calculate an AFA rate that may be applicable to parties, such as BWA itself, that have failed to cooperate." Final Remand Redetermination 17. But at oral argument, counsel for Commerce agreed with the court's statement that "this AFA rate is only being used to calculate the separate rate for the appellant [Jiangsu Jianghai] and for no other purpose," and confirmed that the new rate would not be applied to non-cooperating respondents. Oral Argument at 20:21-20:47, available at http://www.cafc.uscourts.gov/oral-argument-recordings/all/changzhou.html.

establish the estimated all-others rate for exporters and producers not individually investigated, *including* averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B) (emphases added). We have recognized that in some circumstances, antidumping investigations require calculations that are "by necessity imperfect," and we consider the circumstances when reviewing Commerce's application of the statute. *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1309 (Fed. Cir. 2010).

The appellant has not argued that the simple average methodology suggested by the statute is unreasonable in all circumstances, nor even that it is necessarily unreasonable when applied to cooperating parties.[7] Rather, the appellant argued to Commerce and before the Court of International Trade that Commerce's stated reasons for its approach were arbitrary, because deterrence is not a sufficient justification when calculating a rate that solely affects cooperating respondents.[8] The parties continued

---

[7] In *KYD*, this court held that an AFA rate calculated for a non-cooperating exporter could be applied to a cooperating importer of that exporter's goods. *KYD, Inc., v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010). *KYD* did not address the application of an AFA rate to cooperating importers of other exporters' goods, nor the use of an AFA rate in deriving the separate rate for cooperating parties.

[8] Commerce claims the appellant waived this argument by "agree[ing] with the Department and the petitioner that the Separate Rate should be calculated by simple averaging of the rate for Wujin Water with the revised AFA rate." Resp. of Wujin Fine Chemical & Jiangsu Jianghai to Pet'r's Comments at 2, *Changzhou Wujin Fine Chem. Factory Co. v. United States*, No. 09-CV-0216 (Ct. Int'l Trade Apr. 5, 2010), ECF No. 47-7. But this overlooks the ongoing dispute between the parties as

to dispute this point in their briefs on appeal. The appellant contended that

> [t]he most appropriate, if not the only appropriate method [of calculating the appellant's separate rate], is to use the Q&V [data] of the appellant, and another cooperative party which actively participated in the investigation and provided multiple responses to Department questionnaires. . . . The Department rejected the use of this data alleging that it would result in an AFA rate which would be zero and that a rate of zero would not act as a deterrent. Appellant notes that the new "AFA" rate would not be used for any purpose other than assigning a rate to Appellant, a coop-

---

to how the "revised AFA rate" in question should be calculated. The appellant argues that basing that rate solely on BWA's data is "arbitrary and capricious" because, inter alia, the deterrence rationale advanced by Commerce on remand is inapplicable to a rate calculation that can only affect cooperating respondents. *See* Appellant's Br. 34-35: Pls.' Comments on Remand 12-13.

We "must [] consider whether Commerce's *application* of the facts available was reasonable and supported by substantial evidence." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1258 (Fed. Cir. 2009). Here, the appellant's challenge to the hypothetical AFA rate has two aspects: first, that Commerce's deterrence-oriented calculation was not a reasonable method of obtaining a separate rate, and was therefore arbitrary; and second, that substantial evidence does not support the use of the AFA rate in any event. Both aspects of the appellant's challenge to the use of the AFA rate in this case are consistent with its general concession that simple averaging is not impermissible, so long as the methodology does not produce an unlawful result. Because the appellant is correct that Commerce's use of the AFA rate in this case is not reasonable, we need not decide the merits of the other aspect of its challenge.

erative [separate rate applicant] respondent. . . . [D]eterrence is not the only factor involved in calculating an AFA rate, and deterrence is never a factor in calculating a non-AFA rate.

Appellant's Br. 34–35. Commerce responded that "a zero percent adverse facts available rate would not be sufficiently adverse to effectuate the purpose of the adverse facts available rule," Appellee's Br. 32, and therefore

> when Commerce determines an [AFA] rate, it selects a rate that is sufficiently adverse and selects the highest rate in the record of the proceeding to ensure the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. Selecting Kewei's data, which would have yielded a zero percent facts available rate, would not satisfy this standard.

*Id.* at 36 (citation omitted). In its reply brief, the appellant continued to argue that "[t]he United States['] entire basis for the selection of a new U.S. price in this matter is that of 'deterrence.' This results oriented method is not a sufficient basis for the selection of an AFA rate," Reply Br. 9, to be used solely "as a substitute in the calculation" of a separate rate for cooperating respondents. *Id.* at 9 n.1.

The question is whether Commerce's method was arbitrary and capricious. The dissent urges that the arbitrary and capricious standard is inapplicable, and that we should instead apply a substantial evidence standard. What the dissent fails to appreciate, however, is that a reviewing court must apply both standards, and that "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious

action." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974). The dissent correctly points out that the substantial evidence standard applies to review of factual determinations. But here we are evaluating the agency's reasoning, which is reviewed under the arbitrary and capricious (or contrary to law) standard. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983). Therefore, we first ask whether Commerce articulated an adequate reason for calculating the appellant's separate rate in the manner chosen on remand.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp*, 318 U.S. 80, 87 (1943). Tellingly, Commerce has not contended that BWA's data are more reliable or accurate than data from the other respondents.[9] Rather, the Final Remand Redetermination explained that Commerce used BWA's data to obtain an adverse margin. Commerce determined that any other respondent's U.S. price data (or any com-

---

[9] The appellant argues that using BWA's unverified U.S. price information resulted in a rate fifteen times higher than the highest rate calculated for a mandatory respondent. While conceding that other respondents' data would have resulted in a lower rate, Commerce insists there is no way to prove the other respondents' data are more reliable, because their data were not verified either. That is hardly appellant's fault: it was Commerce, not the appellant, who decided which data would be verified. Furthermore, Commerce refused to use data from Kewei, the other non-cooperating respondent, even though Kewei was a high-volume exporter similarly situated to BWA, cooperated longer than BWA, and—unlike BWA—was a mandatory respondent. The only reason given by the Final Remand Redetermination for using BWA's data, but not also Kewei's, was that including Kewei's yielded an insufficiently adverse rate.

bination of BWA's data with another respondent's data) would have produced a *de minimis* hypothetical AFA rate, a result Commerce found unacceptable:

> [a]n AFA rate of zero [or *de minimis*] *would not be sufficiently adverse as to effectuate the purpose of the facts available rule* to induce respondents to provide the Department with complete and accurate information in a timely manner and would not ensure that uncooperative parties do not obtain a more favorable result by failing to cooperate than if they had had cooperated fully.

Final Remand Redetermination 16 (emphasis added). In other words, Commerce chose to use BWA's data in the course of recalculating the appellant's separate rate because those data gave the most adverse margin possible, and an adverse margin is necessary to deter non-cooperating respondents. *See also de Cecco*, 216 F.3d at 1032.

Deterrence is not relevant here, where the "AFA rate" only impacts cooperating respondents. We find no support in our caselaw or the statute's plain text for the proposition that deterrence, rather than fairness or accuracy, is the "overriding purpose" of the antidumping statue when calculating a rate for a cooperating party. *See, e.g.*, *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007) ("[A]n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible. . .") (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Quite the contrary: applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute. Commerce misses the point when it argues that the appellant

cannot complain because it does not bear an AFA rate directly, but only a separate rate derived from the AFA rate, which is only half as adverse. Although the hypothetical AFA rate was not *directly* applied to a cooperating respondent, cooperating respondents were the *only* entities impacted by the recalculated rate.

Contrary to Commerce's argument, the AFA statute does not compel this result. Commerce maintains that despite its broad discretion in making antidumping determinations, its hands are tied by section 1673d(c)(5)(B), which requires that the appellant's separate rate be based on a traditional AFA rate. But the statute does not say that. Section 1673d(c)(5)(B) states that Commerce is to select "*any reasonable method* to establish the estimated all-others rate for exporters and producers not individually investigated, *including* averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B) (emphases added). The statute's use of the word "including" contemplates the possibility of other valid approaches, and the requirement that the method be "reasonable" imposes a duty on Commerce to select a method appropriate for the circumstances. Furthermore, AFA rates are disfavored by the statute: section 1673d(c)(5)(B) is an exception to the preferred method in section 1673d(c)(5)(A), which instructs that AFA rates, like *de minimis* and zero rates, should be excluded. Indeed, the only AFA rates contemplated under section 1673d(c)(5)(B)'s simple average methodology are those determined for "individually investigated" parties. Such rates are generally based on verified data, *see* 19 U.S.C. § 1677m(i)(1), and bear a reasonable relationship to the party's actual business practices. *See Gallant Ocean*, 602 F.3d at 1323 (even "[a]n AFA rate must be a reasonably accurate estimate of

the respondent's actual rate, albeit with some built-in increase intended as a deterrent" (internal quotation marks omitted)). Substitution of a hypothetical "AFA rate" inapplicable to any individually investigated party is neither suggested nor compelled by the statute, particularly where the sole impact of that substitution will be on cooperating parties.

Finally, while administrative convenience might support averaging previously-determined, previously-corroborated rates assigned to mandatory respondents, including AFA respondents if there are no alternatives, *see* 19 U.S.C. § 1673d(c)(5)(B), such a justification can hardly support Commerce's choice to calculate a hypothetical "AFA rate" for use solely as a "substitute" rate that will not be assigned to any mandatory respondent.

In summary, the issue before the court is not whether Commerce properly considers the policy goals of the antidumping statute in conducting its investigations (it does), nor whether Commerce may draw adverse inferences when assigning AFA rates to non-cooperating respondents (it may). Rather, we address the narrower question of whether Commerce acted reasonably when—by its own account—it cherry-picked the single data point that would have the most adverse effect possible on cooperating voluntary respondents, in a situation where there was no need or justification for deterrence. "[R]eview of an administrative decision must be made on the grounds relied on by the agency. 'If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" *In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002) (quoting *Chenery*, 332 U.S. at 196). In this case, we think it clear that Commerce acted in an arbitrary and capricious manner.

For the foregoing reasons, we affirm the decision of the Court of International Trade in part, reverse in part, and remand to Commerce to once again reconsider its approach to calculating the appellant's separate rate. In doing so, Commerce must act non-arbitrarily and must explain why its approach is a "reasonable method" of calculating a separate rate, in light of the alternatives available, and with recognition of the fact that the remand calculation will affect only cooperating respondents.

## AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED

### COSTS

Each party shall bear its own costs.

# United States Court of Appeals for the Federal Circuit

---

**CHANGZHOU WUJIN FINE CHEMICAL FACTORY CO., LTD.,**
*Plaintiff,*

AND

**JIANGSU JIANGHAI CHEMICAL GROUP, LTD.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

AND

**COMPASS CHEMICAL INTERNATIONAL, LLC,**
*Defendant-Appellee.*

---

2011-1080

---

Appeal from the United States Court of International Trade in case no. 09-CV-0216, Judge Judith M. Barzilay.

---

REYNA, *Circuit Judge*, dissenting.

The majority's conclusion that the Department of Commerce ("Commerce") acted arbitrarily when it assigned appellant Jiangsu Jianghai Chemical Group, Ltd.

a company-specific Adverse Facts Available ("AFA") rate is based on three fundamental errors.

First, the majority goes to great length to address an AFA issue that was neither appealed nor otherwise properly before this court. Appellant had conceded that specific issue in the underlying proceedings before Commerce and the Court of International Trade.

Second, the majority manifests a fundamental misunderstanding of the AFA statute and how AFA applies in the context of antidumping duty investigations. The majority writes to cure what it perceives to be an injustice created by Commerce applying AFA to a voluntary, cooperating respondent. But the AFA statute operates both to encourage cooperation in antidumping investigations, and to prevent absurd or unjust results when parties, cooperating or not, have submitted incomplete or unusable data, such as awarding a *de minimis* or zero dumping rate to an undeserving respondent.

Third, the majority applies the wrong standard of review. The majority applies an arbitrary and capricious standard to Commerce's fact finding determinations. Our case law and that of the Court of International Trade makes clear that a substantial evidence standard of review applies with respect to factually based determinations. Consistent with the statute, this court gives deference to the expertise of the administrating authority, particularly with respect to the application of AFA and its choice of methodology.

In sum, the majority has created its own issue, which it hoists with non-existing terminology,[1] it seeks to correct a wrong and sets the foundation for absurd results in the future, and it conducts its analysis under the wrong standard of review.  I dissent.

## I.  The Issue on Appeal

The majority asserts that only two issues were on appeal and that the second issue was framed as follows:

> "[W]hether Commerce acted arbitrarily in recalculating the appellant's separate rate, when Commerce constructed a hypothetical AFA rate based on U.S. price data obtained from a non-cooperating respondent, averaged that hypothetical AFA rate with the *de minimis* rate for Wujin Water, and then assigned the resulting separate rate to the appellant.

Majority op. at 15.  This statement of the AFA issue on appeal is symptomatic of the majority opinion: It represents the point of mistaken embarkation from which the opinion sails into areas well beyond the scope of this appeal.  It introduces a new term to antidumping law, "hypothetical AFA rate," with the apparent purpose of injecting anomaly into what is essentially a typical AFA case.

The appellant, in fact, raises four issues on this appeal.  In its brief at the Statement of Issues section, appellant details only four issues: two issues pertain to whether Commerce exceeded the scope of the remand

---

[1]    The majority gives great attention to the term "hypothetical AFA rate."  But there is no such term in antidumping law, and its meaning remains unclear.

order, and a third issue pertains to Commerce's decision to recalculate U.S. price on remand. The fourth issue appellant raises is the only issue that pertains to the AFA rate assigned to appellant. A simple review of this issue reveals that it is markedly different from the issue the majority framed. Compare the following issue with the issue as restated by the majority.

4. Whether the U.S. Court of International Trade committed error when it ratified the Department's arbitrary selection of *certain data* to form the basis for a recalculated U.S. price in the remand determination.

Appellant's Br. at 3 (emphasis added).

A comparison of the majority's and the appellant's issues reveals that the majority devotes its attention to whether Commerce acted arbitrarily in the methodology used to arrive at, or calculate, the AFA rate. Appellant, however, does not challenge the methodology, but rather the data selected by Commerce to recalculate the new U.S. price. In fact, appellant conceded before Commerce and the Court of International Trade that it did not challenge the AFA methodology.

The substantive difference between data used in antidumping calculations and the methodology Commerce adopts to perform antidumping calculations is profound.

The majority opinion demonstrates a failure to distinguish between data and methodology in the context of antidumping duty investigations and instead addresses methodology when the appeal is about the data.

Indeed, litigants in dumping cases understand well the distinction between data and methodology as the two

areas are often the points of greatest contention. This case is a good example of how litigants will base a strategy on data and not methodology, or vice versa. As the appellant notes in its brief, it stood to receive a zero dumping margin had Commerce made the adjustments it sought to normal value (and which it sought on remand) while retaining the same methodology used in the investigation to arrive at the appellant's separate rate. What appellant failed to forecast was that Commerce on remand would recalculate U.S. price and use U.S. sales data taken from BWA's questionnaire responses. As a result, on remand its margins were only cut in half, as opposed to driven to zero. This is why on this appeal the appellant challenges (1) Commerce's authority to recalculate a new U.S. price (that it exceeded the scope of the remand order), and (2) that Commerce acted arbitrarily in its use of the BWA data (because it should have used data from the petition or its own data). If it wins on either issue, it stands to obtain a zero margin.[2]

---

[2] Curiously, because of the majority opinion, the appellant may have won the battle, but lost the war. The majority offers no clear guidance as to how Commerce is to proceed. It appears to instruct Commerce that it can no longer apply any AFA methodology when calculating a separate rate for a cooperating respondent whose submitted data was deficient. If the majority opinion instructs that on remand U.S. price must be recalculated using U.S. sales data or data from sources other than BWA, it is worth noting that both the petitioner's and the appellant's data have previously been ruled as inappropriate due to, among other things, non-corroboration and incompleteness. I believe that since we conduct our reviews *de novo* and on the basis of the entire record, it behooved the majority to inform Commerce how to proceed on remand. In any event, appellant now stands to achieve a higher margin than it obtained in either the investigation or the remand.

## II. The Standard of Review

In addition to addressing the wrong issue as a result of failing to distinguish between data and methodology, the majority goes on to apply the wrong standard of review. As noted below, the correct standard of review for Commerce's factual determinations is substantial evidence.[3] *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Here, the majority denies the administrating authority the deference owed to it under law and case precedent and instead disturbs well supported findings of fact with its own view on how the case should have resulted.[4]

---

[3] The majority's "contention that the imposition of adverse facts available was an 'abuse of discretion' is a misstatement of the proper standard of review. . . . [This court reviews such decisions] under the substantial evidence standard . . . as opposed to the 'arbitrary, capricious, abuse of discretion' standard." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) ("We will uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'"). Substantial evidence review is particularly appropriate in cases like this one where Commerce must fashion its own rules of procedure and pursue methods of inquiry capable of permitting it to discharge its multitudinous duties. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012)

[4] The majority justifies its departure from the substantial evidence standard of review on the grounds that it "must" also determine whether the agency's factual finding is arbitrary and capricious. This is incorrect with respect to Commerce's antidumping determinations. We have repeatedly upheld determinations that are supported by substantial evidence where anything more than a "mere scintillia" exists to support Commerce's determination and, in doing so, have resisted the urge to insert our judgment for that of Commerce. *See, e.g., PAM, S.p.A.*

### III.  The Purpose of AFA

The errors advanced by majority opinion portend grave consequences in the application of the U.S. anti-dumping statutes.  In particular, the majority opinion creates a new AFA standard for cooperating respondents whose data is incomplete or inaccurate.  This is because the majority sees only one side of the AFA deterrence coin, that AFA rates are intended to compel participation in dumping cases.  It fails to see the flip side of the coin; AFA rates also ensure that a cooperating respondent whose data for whatever reason is insufficient is not undeservedly awarded a *de minimis* or zero dumping rate. *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("Commerce may impose an adverse inference after determining that a respondent has not been fully cooperative or *has failed to act to the best of its ability* in gathering information." (emphasis added)).  At bottom, the majority addresses an issue not in controversy to inject its view of fairness into dumping proceedings by replacing the judgment of the administrating agency with its own.

### IV.  The AFA Data and Methodology

I agree with Commerce that recalculating U.S. price was within the scope of the voluntary remand order. Nothing in the remand order limited Commerce only to recalculating the normal value when "examining . . . whether [it] corroborated the adverse facts available rate upon which it relied in calculating the separate rate." *See Changzhou Wujin Fine Chem. Factory Co. v. United*

---

*v. United States*, 582 F.3d 1336 (Fed. Cir. 2009); *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247 (Fed. Cir. 2009); *Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009); *Ta Chen*, 298 F.3d 1330.

*States*, No. 09-00216, 2010 Ct. Intl. Trade LEXIS 108, at *1-2 (Ct. Int'l Trade Feb. 8, 2010). After requesting a remand in the terms adopted verbatim by the Court of International Trade, Commerce further requested that "if the Court grants [Commerce's] request for a partial remand, the Court allow Commerce . . . to examine the issues related to the adverse facts available rate, to make any necessary recalculations based on its examination, and to obtain comments from the parties." Joint App'x at 1480, 1501. Appellant apparently did not challenge this request.

Once Commerce determined that it could not corroborate the AFA rate, it had to calculate a new AFA rate for purposes of calculating appellant's separate rate. Because AFA rates are based on the difference between the normal value and U.S. price, Commerce's establishment of the AFA rate necessarily involved considering the continued viability of both normal value and U.S. price. *See* 19 U.S.C. § 1673e(a)(1). Commerce could no longer rely on uncorroborated secondary information for normal value and U.S. price. *See* 19 U.S.C. § 1677e(c). Thus, Commerce's decision to establish a new U.S. price susceptible to corroboration was reasonable, well within its authority, and not contrary to law. *Id.* That no party challenged the U.S price prior to the remand is immaterial. Commerce acted within the remand's scope when it recalculated U.S. price to arrive at a new AFA rate and a new separate rate for appellant.

Nor did Commerce err in its recalculation of appellant's separate rate. Generally, the separate rate is the weighted average of dumping margins established for entities individually investigated, excluding zero and *de minimis* margins, and margins determined entirely on the basis of AFA. 19 U.S.C. § 1673d(c)(5)(A). As in this case,

where dumping margins for all entities individually investigated are zero or *de minimis* or determined entirely on the basis of AFA, Commerce may use any reasonable method for establishing the separate rate for entities not individually investigated, including averaging the dumping margins of entities individually investigated. § 1673d(c)(5)(B).

Throughout the investigation and on remand, Commerce has consistently applied a methodology for calculating separate AFA rates whereby it averaged the dumping margins assigned to the entities that were individually investigated. Appellant has not challenged Commerce's decision to use this methodology before the Court of International Trade, nor has it done so on this appeal. U.S. Appellee Br. at 33; Compass Appellee Br. at 9 n.2. The records shows that appellant has specifically endorsed this methodology, Joint App'x at 1571; 1582-83, and directs its challenge solely to Commerce's decision to use BWA's U.S. price in the AFA calculation.[5] Stated differently, appellant challenges the data used, not the methodology employed.

Appellant offers a host of reasons why it believes that Commerce's decision to use the *U.S. price of BWA*, a single uncooperative respondent, in its AFA rate calculation was contrary to law. It argues that BWA's U.S. price is an "extreme outlier" and does not reflect a "commercial

---

[5]    BWA was an uncooperative respondent, but it had submitted a Q&V questionnaire response early in the investigation. Based on its response, Commerce was able to determine the average unit value (value divided by quantity), which approximated the U.S. price of its merchandise during the period of investigation.

reality."[6]   Appellant relies on *Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010), where this court held that an AFA rate more than five times higher than the highest rate applied to a cooperating respondent was not supported by substantial evidence. 602 F.3d at 1324.  Because nothing in the record in that case tied the AFA rate—derived from an adjusted petition rate—to Gallant, we concluded that the AFA rate was unrelated to commercial reality and not a reasonable accurate estimate of Gallant's actual dumping, hence, not supported by substantial evidence.  *Id.*  Notably, we observed that "[t]he fact that Commerce ultimately imposed dumping margins between 5.91% and 6.82% for the same products after its initial investigation shows the possession of better information and shows that the adjusted petition rate was aberrational."  *Id.* at 1323-24. We counseled Commerce that it should have relied on representative dumping rates of similarly-sized and similarly-situated exporters, which could have provided a reasonable basis from which to calculate an appropriate AFA rate.  *Id.* at 1324.

Appellant's reliance on *Gallant Ocean* is misplaced. First, although the AFA rate determined by Commerce in this case is arguably a multiple of the highest calculated rate, Appellant Br. at 37, the AFA rate was not applied to appellant directly, but rather was used to calculate a separate rate.  It would be unreasonable to require such a rate to reflect a commercial reality of appellant.  *Compare Gallant Ocean*, 602 F.3d at 1323-24 (reversing a 57.64%

---

[6]   The majority asserts that BWA's data was not the best data on record.  It does not, however, respond to the appellant's arguments that BWA's data should not have been used because it was "outlier" data.  Whether BWA's data was adequate is a question of fact that we review for substantial evidence.

AFA rate applied to Gallant because it had no grounding in Gallant's commercial reality), *with PAM, S.p.A. v. United States*, 582 F.3d 1336, 1336, 1340 (Fed. Cir. 2009) (affirming a 45.49% AFA rate applied to PAM although only 0.5% of its U.S. sales were at that margin), *and Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002) (affirming a 30.95% AFA rate applied to Ta Chen although only 0.04% of its sales during the period of review were at that margin).

Second, this court in *Gallant Ocean* held that "Commerce failed to corroborate the adjusted petition rate with 'independent sources that are reasonably at [its] disposal.'" 602 F.3d at 1324 (alteration in original) (citing 19 U.S.C. § 1677e(c)). By contrast, Commerce in this case abandoned the petition rate on remand when it determined that it could no longer corroborate it. Since Commerce relied on "information obtained in the course of an investigation" on remand, it was not obligated to corroborate either BWA or Wujin Water's data. *See* § 1677e(c). We have previously recognized that as long as the data is corroborated, or as here, does not require corroboration, "Commerce acts within its discretion when choosing which sources and facts it will rely on to support an adverse inference." *PAM,* 582 F.3d at 1340 (quoting *Ta Chen*, 298 F.3d at 1339); *see also F.Lli de Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("Commerce's special expertise makes it the 'master' of the anti-dumping law, entitling its decisions to great deference from the courts.").

Finally, whereas Commerce "possess[ed] . . . better information" and "had abundant resources from which to calculate a reasonable AFA rate" in *Gallant Ocean*, 602 F.3d at 1323-24, any other combination of U.S. price data in this case, other than BWA's alone, would have resulted

in a zero or *de minimis* dumping margin. Commerce wields the AFA rate to deter noncompliance with its investigations. *de Cecco*, 216 F.3d at 1032. This objective would be undermined if we compelled it to use *de minimis* AFA rates. As Commerce observed,

> [a]n AFA rate of zero [or *de minimis*] would not be sufficiently adverse as to effectuate the purpose of the facts available rule to induce respondents to provide the Department with complete and accurate information in a timely manner and would not ensure that uncooperative parties do not obtain a more favorable result by failing to cooperate than if they had had cooperated fully.

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, No. 09-00216, ECF No. 44, at 16 (Apr. 30, 2010) (Final Results of Redetermination Pursuant to Court Order).

The circumstances of this case are distinct in that Commerce redetermined the AFA rate on remand solely for the purposes of determining appellant's separate rate; the other non-cooperative respondents did not challenge, and thus were assigned, the AFA petition rate of 72.42%. Yet it remained within Commerce's discretion to choose which sources and facts to rely on to support an adverse inference. *See de Cecco*, 216 F.3d at 1032. Appellant's failure to challenge as unreasonable Commerce's separate rate calculation methodology exposed it to the consequences flowing from Commerce's discretion to select an AFA rate sufficiently adverse to effectuate the purposes of the statute. While Commerce's discretion was not boundless, *id.*, assigning an AFA rate of zero or *de minimis* would be contrary to the statutory objectives of the AFA rate. Indeed, if Commerce had used any of the alternative

data sources appellant advances in this appeal, a *de minimis* AFA rate would result.

I therefore would hold that Commerce's reliance on BWA's data for U.S. price, and that the methodology it selected to calculate the separate rate for appellant was supported by substantial evidence and otherwise not contrary to law.