# United States Court of Appeals for the Federal Circuit

_____

**BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S.,**
*Plaintiff-Appellee*

**UNITED STATES,**
*Defendant*

**v.**

**AMERICAN CAST IRON PIPE COMPANY, BERG STEEL PIPE CORP., BERG SPIRAL PIPE CORP., DURA-BOND INDUSTRIES, STUPP CORPORATION, INDIVIDUALLY AND AS MEMBERS OF THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION, GREENS BAYOU PIPE MILL, LP, JSW STEEL (USA) INC., SKYLINE STEEL, TRINITY PRODUCTS LLC, WELSPUN TUBULAR LLC USA,**
*Defendants-Appellants*

_____

2020-2014

_____

Appeal from the United States Court of International Trade in Nos. 1:19-cv-00056-JAR, 1:19-cv-00080-JAR, Senior Judge Jane A. Restani.

_____

Decided:  July 20, 2021

_____

JULIE MENDOZA, Morris, Manning & Martin, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by DONALD CAMERON, JR., SABAHAT CHAUDHARY, EUGENE DEGNAN, MARY HODGINS, BRADY MILLS, R. WILL PLANERT, EDWARD JOHN THOMAS, III.

TIMOTHY C. BRIGHTBILL, Wiley Rein LLP, Washington, DC, argued for defendants-appellants. Also represented by TESSA V. CAPELOTO, LAURA EL-SABAAWI, MAUREEN E. THORSON, ENBAR TOLEDANO.

---

Before MOORE, *Chief Judge*\*, DYK, and REYNA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Dissenting opinion filed by *Circuit Judge* DYK.

REYNA, *Circuit Judge*.

The American Cast Iron Pipe Company and other domestic producers of large diameter welded pipe appeal a judgment by the Court of International Trade involving certain price adjustments that were made in the course of an antidumping duty investigation. Appellee Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. claims that it is entitled to a post-sale price adjustment based on the total value of penalties it paid for late delivery of product to a customer. The Court of International Trade agreed and remanded to the U.S. Department of Commerce with instructions to grant the claimed post-sale price adjustment and recalculate the resulting antidumping duty margins. On remand, the Department of Commerce granted the post-sale price adjustment, which produced a *de minimis* antidumping duty rate. This appeal followed. Because we

---

\*    Chief Judge Kimberly A. Moore assumed the position of Chief Judge on May 22, 2021.

conclude that the Department of Commerce's original post-sale price adjustment was supported by substantial evidence and in accordance with law, we reverse.

## BACKGROUND

Generally, antidumping duty rates are determined by price comparison. The U.S. Department of Commerce ("Commerce") compares the price of sales of the product under investigation that were made during the period of investigation in both the home (foreign) market and in the U.S. market. The difference in the prices is referred to as the less than fair value margin. 19 U.S.C. § 1677f-1(d). The less than fair value margin is the basis for the establishment of antidumping duty rates.

Differences in circumstances of sale can affect the level of prices respectively in both the U.S. market and the (foreign) home market, such as rebates, taxes, shipping, and fuel. Because of these differences in circumstances, prices must be adjusted to ensure an apples-to-apples comparison. *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995). Specifically, prices must be net of any "price adjustment." 19 C.F.R. § 351.401(c). Because post-sale price adjustments[1] may significantly affect the level of antidumping duty margins, post-sale price adjustments are not permitted unless a party can show that it is entitled to the adjustment.

This appeal involves whether Borusan Mannesmann Boru Sanayi Ve Ticaret A.S ("Borusan") is entitled to a post-sale price adjustment. We start with the observation that the record indicates that if the post-sale price adjustment here is permitted, the antidumping duty margin falls

---

[1]    A post-sale price adjustment is an "adjust[ment] due to differences in the circumstances of sales" made after a sale. *NTN Bearing Corp. of Am. v. United States*, 295 F.3d 1263, 1267 (Fed. Cir. 2002).

to a *de minimis* level, a zero margin. If the post-sale adjustment is not permitted, Borusan could be subject to 5.11 percent antidumping duty margin. Whether the post-sale price adjustment should be permitted in this case turns on the question of whether the circumstances underlying the adjustment were established and known to Borusan's customer at the time the sale was made to the customer.

Borusan is a Turkish producer of large diameter welded pipe ("LD WP"), a type of welded pipe used in the construction of oil and gas pipeline projects. J.A. 5092–94. On September 10, 2013, Borusan and two other Turkish LD WP producers (collectively, the "JVA members") entered into a Joint Venture Agreement ("JVA"). J.A. 17, 2277–80. Specifically, the JVA members entered into the JVA for the purpose of bidding on a pipeline project[2] in Turkey, which would span hundreds of miles and required multiple sizes of LD WP. J.A. 2915–19. The three JVA members agreed to be jointly and severally liable for failures to perform under the contract. J.A. 17, 22–23. Each member agreed to reimburse the other two for any damages resulting from that specific member's failure to fulfill its obligations. J.A. 2278.

On March 3, 2014, the JVA members entered into a Consortium Agreement which, like the JVA, stated that the parties would be jointly and severally responsible and liable towards the client. J.A. 2286, 2903. The Consortium Agreement also provided that the parties would share equally in the award, if obtained, and would take equal shares of responsibility for fulfilling the requirements. J.A. 17. A copy of the original Consortium Agreement was sent to the client. J.A. 2904.

---

[2] The JVA referred to the pipeline project as the "client." *See* J.A. 17.

The JVA members were successful and won the bid on the gas pipeline project. On October 14, 2014, the JVA members and the client entered into a sales contract titled "Procurement Contract relating to the Supply of Line Pipes and Hot Bends" ("Sales Contract"). J.A. 2781. The Sales Contract incorporated the Consortium Agreement as Appendix L. J.A. 2903–04. It did not, however, incorporate the JVA. Like the JVA and the Consortium Agreement, the Sales Contract provided that the three JVA members were jointly and severally liable to the client for damages resulting from the members' failure to fulfill their obligations. J.A. 2867–68.

Under the Sales Contract, the JVA members agreed to provide 56" and 48" LD WP to the client per a set schedule. The parties subsequently amended the Sales Contract to change the amount of 56" LD WP required and to revise the delivery and completion schedule and pricing schedule. J.A. 4359. Due to delay, the JVA members incurred late delivery penalties for both 56" and 48" LD WP. *See, e.g.*, J.A. 4360.

On June 9, 2017, after the JVA members delivered all the ordered 56" LD WP, the client notified the members that it sought an amount of money as a penalty for late deliveries of 56" pipe. *Id.* The JVA members responded with a letter requesting that the client withdraw its damages demand, arguing that factors beyond the JVA members' control, including the client's own procedural changes, caused the delivery delays. J.A. 4361.

On September 6, 2017, after all ordered 48" pipe was delivered, the client notified the JVA members that it sought an additional amount as a penalty for late deliveries of the 48" pipe. *Id.* The members again responded the following month in a letter asking the client to cancel its damages demand, reiterating substantially the same arguments they had made with respect to the late delivery penalties for the 56" pipe. *Id.* Negotiations between the

client and the JVA members regarding damages continued well into 2018.

On January 17, 2018, the appellants, domestic producers of LD WP, requested that Commerce and the U.S. International Trade Commission initiate antidumping duty investigations on U.S. imports of LD WP from Turkey. Petitioners alleged that the U.S. LD WP industry was materially injured by sales of imports at less than fair value from six countries, including Turkey.[3] J.A. 85–92. Commerce initiated an antidumping duty investigation in February 2018, covering a review period from January 1, 2017 through December 31, 2017. J.A. 85–86 (Large Diameter Welded Pipe from Canada, Greece, India, the People's Republic of China, the Republic of Korea, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations, 83 Fed. Reg. 7,154 (Feb. 20, 2018)).

Commerce issued antidumping duty questionnaires to several Turkish producers of LD WP, including Borusan. In its initial questionnaire response dated April 23, 2018, Borusan claimed that it was entitled to a post-sale price adjustment to account for the late delivery penalties it had incurred in the pipeline project. J.A. 1216. Specifically, Borusan sought a post-sale price adjustment equal to the entire value of the penalty and represented that it had "agreed to pay its customer" that amount for a "disputed penalty for late delivery on sales." *Id.* Borusan, however, had not yet made any penalty payment and, in fact, the JVA members including Borusan were still negotiating the penalty amount with the client. On May 28, 2018, the client responded to the JVA members' July 2017 and October 2017 letters stating that the client agreed that it had contributed to the delivery delays and accordingly lowered the

---

[3]     The U.S. International Trade Commission's participation in the ensuing underlying antidumping duty investigation is not relevant to this appeal.

penalties for both the 56" pipe and the 48" pipe.  J.A. 4361.
On June 11, 2018, after further discussions with the client,
the JVA members agreed to the reduced penalty amounts.
*Id.*  That same day, the JVA members created a protocol
that allocated the total penalty among the three members
proportionally to each member's responsibility for the de-
lay.  J.A. 3003.  The JVA members further agreed Borusan
would be responsible for the largest share of the total pen-
alty ("final allocation").  J.A. 3004.

On June 15, 2018, Borusan informed Commerce that it
had reached an agreement with the client and the JVA
members as to its final allocation of the penalty.  J.A. 2230–
31.  Borusan further stated that the penalty was subject to
an ongoing dispute among the JVA members, such that no
final payment had been made, but the penalty was being
allocated to the members proportionally to their share of
responsibility, i.e., per the final allocation.  J.A. 2230–32.
Borusan explained:

> Under [the Sales Contract], the [JVA] members
> agreed to provide a designated quantity of various
> sizes and dimensions of LD pipe as a group.  No
> individual agreements were made between [the cli-
> ent] and the [three] producers.  The [JVA] members
> in the [Joint Venture Agreement] dated [Septem-
> ber 10, 2013] . . . agreed that each company would
> supply [one-third] of the total contracted quantity.
> [The client] was not a party to this agreement and
> considered the supply contract to be with [the JVA
> members as an entity].  The supply contract be-
> tween [the client and JVA members] includes a de-
> livery schedule with deadlines (guaranteed
> completion dates).  Unfortunately, due to various
> reasons beyond their control, none of the members
> could fully comply with the contractual delivery
> schedule.  The majority of the delay and the liqui-
> dated damages claim were due to delays by [Bo-
> rusan].

J.A. 2231.

On June 29, 2018, the JVA members and the client executed a settlement agreement in which the members promised to pay the agreed-upon penalty amount. In accordance with the Sales Contract, each JVA member was billed one-third of the penalty ("initial allocation"), but Borusan assumed responsibility for its final allocation of the total penalty, a larger sum. J.A. 4362. The members signed a mutual release based on the settlement agreement. On July 6, 2018, Borusan filed the executed settlement agreement with Commerce. J.A. 5072–73. Of note, the original Sales Contract with the client was executed in October 2014, while this final allocation was established years after execution of the settlement agreement.

On August 27, 2018, Commerce published a Preliminary Determination, assigning Borusan an antidumping duty rate of 5.29 percent *ad valorem*. J.A. 3577 (Large Diameter Welded Pipe from the Republic of Turkey: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 83 Fed. Reg. 43,646, 43,647 (Aug. 27, 2018)). In September 2018 in response to Commerce's request, Borusan provided Commerce with sales verification documentation pertaining to Borusan's payment of its share of the penalty to the client. J.A. 3580.

On February 27, 2019, Commerce published its Final Determination in which Commerce rejected Borusan's claimed post-sale price adjustment and assigned Borusan an antidumping duty rate of 5.11 percent *ad valorem*. J.A. 5092 (Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 6,362 (Feb. 27, 2019)); J.A. 5101. Commerce explained that, under its regulations, it "generally will not consider a price adjustment that reduces or eliminates dumping margins unless the party claiming such price adjustments demonstrates that the conditions of the adjustment were established and known to the customer at

the time of sale." J.A. 5071 (quoting Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,642 (Mar. 24, 2016) ("Modification")). Commerce further explained that it considers a number of factors in determining whether a party has demonstrated entitlement to a post-sale price adjustment:

(1) Whether the terms and conditions of the adjustment were established and/or known[4] to the customer at the time of sale, and whether this can be demonstrated through documentation;

(2) How common such post-sale adjustments are for the company and/or industry;

(3) The timing of the adjustment;

(4) The number of such adjustments in the proceeding; and

(5) Any other factors tending to reflect on the legitimacy of the claimed adjustment.

---

[4] Although Commerce used the phrase "established and/or known" in other sections of the Modification, Commerce requires that the terms and conditions be established *and* known. *See* Modification, 81 Fed. Reg. at 15,642 ("Since enacting these regulations, the Department has consistently applied its practice of not granting [post-sale] price adjustments where the terms and conditions were not *established and known* to the customer at the time of sale." (emphasis added)); *id.* ("[T]he Department generally will not consider a [post-sale] price adjustment that reduces or eliminates dumping margins unless the party claiming such [post-sale] price adjustment demonstrates that the terms and conditions of the adjustment were *established and known* to the customer at the time of sale." (emphasis added)).

J.A. 5071 (quoting Modification, 81 Fed. Reg. at 15,644–45).

Applying these factors, Commerce determined that Borusan was entitled to a post-sale price adjustment for the penalties paid to the client. J.A. 5073. Commerce, however, calculated the post-sale price adjustment on the basis of one-third of the full penalty amount (the initial allocation) and not Borusan's final allocation of the penalty. *Id.* Commerce used the one-third figure because it determined that the one-third allocation method was the allocation established and known to the client at the time of the sale. Commerce noted that the JVA members did not begin to negotiate the final allocation until after the date of sale, and the final allocation was not agreed upon until June 2018. J.A. 5071–74, 5053. For these reasons, Commerce concluded, final allocation of the penalty among the JVA members could not have been established and known to the client at the time of sale. J.A. 5071–72.

Commerce further explained that using the JVA members' final allocation of the penalty would give Borusan an opportunity to manipulate the post-sale price adjustment "because the terms of the amount and allocation were not fixed at the time of sale and the consortium did not determine the final apportionment until after the initiation of the investigation." J.A. 5074. Commerce expressed concern about the legitimacy of the claimed adjustment because Borusan, for example, "changed the amount of this adjustment, at times significantly, in its home market sales database, with little or no explanation"; had "provided no exhibits, supporting documentation, or calculation worksheets" for these modifications; and did not report the final amount of late delivery damages owed until a "little over a month before the *Preliminary Determination*." J.A. 5072–73. Thus, consistent with the "terms and conditions of the adjustment [that] were established and known to the customer at the time of sale," Modification, 81 Fed. Reg. at 15,644–45, Commerce determined a post-sale price

adjustment based on the initial allocation (one-third of the total penalty), which it considered a "reasonable way to address" its concerns regarding any potential manipulation by Borusan, J.A. 5073–74.

Borusan filed suit in the U.S. Court of International Trade ("CIT") on May 2, 2019, pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II). Borusan alleged, among other things, that Commerce had erroneously determined Borusan's post-sale price adjustment based on the one-third initial allocation rather than Borusan's final allocation of the penalty. J.A. 8. Defendants-appellants also filed suit in the CIT, alleging that Commerce erred in its determination that Borusan was entitled to *any* post-sale price adjustment. J.A. 8, 16. Specifically, the appellants argued that Commerce should have applied an adverse inference based on "facts otherwise available" under 19 U.S.C. § 1677e to determine Borusan's entitlement to an adjustment because Borusan was not forthcoming during the investigation about circumstances involving the post-sale adjustment. J.A. 16. The CIT consolidated the two cases and both parties subsequently moved for judgment on the agency record. J.A. 8.

\*　　\*　　\*

On January 7, 2019, the CIT issued its decision sustaining Commerce's determination to grant Borusan a post-sale price adjustment. *See* J.A. 20. The CIT, however, concluded that Commerce erred by basing the post-sale price adjustment on the initial one-third allocation of the total penalty assumed by the three JVA members. J.A. 26–27, 35. The CIT noted that, prior to the sales in question, the JVA established that penalties for the JVA members' failure to perform under the contract would be apportioned among the JVA members based on their responsibility. J.A. 21–23. The CIT stated that the JVA was incorporated by reference into the Sales Contract, and therefore the client should be deemed aware of the JVA's provisions

because that provision was established and known to the client at the time of sale. *Id.* The CIT further reasoned that it was only necessary that the "terms and conditions" be established at the time of sale, not the final amount actually allocated to Borusan. J.A. 23.

The CIT acknowledged Commerce's concern about the potential for Borusan to manipulate the post-sale price adjustment, but it rejected Commerce's concern because "Commerce point[ed] to nothing that suggests an improper manipulation of the adjustment." J.A. 26. The CIT concluded that Commerce "would have accepted the full penalty adjustment" had Borusan not been a party to the JVA. *Id.* The CIT remanded for Commerce to review the record and recalculate the post-sale price adjustment "for whatever amount [Borusan] established it was liable for and *actually paid* or was credited, as authorized by the pre-investigation contract obligations, unless Commerce has evidence not previously cited that shows" manipulation by Borusan. J.A. 26–27 (emphasis added).

On March 9, 2020, Commerce issued its remand determination. J.A. 5413. "Consistent with the [CIT's] remand, and under protest," Commerce granted Borusan a post-sale price adjustment based on Borusan's final allocated share of the penalty. J.A. 5418–19. As a result, Borusan's weighted-average dumping margin was reduced to a *de minimis* amount. J.A. 5413. As a result, Borusan's antidumping duty margin dropped from 5.11 percent to zero. The CIT affirmed Commerce's redetermination on May 22, 2020. J.A. 36–49. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

Standard of Review

This court reviews decisions of the CIT de novo and applies the standard of review the CIT applies in its review of appeals of Commerce's antidumping duty determinations.

*See, e.g.*, *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed. Cir. 1992). Under the applicable standard, we affirm a decision by Commerce where it is supported by substantial evidence and in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i); *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1307–08 (Fed. Cir. 2001). "Substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002). Reasonable minds may differ on the outcome, but "a determination does not fail for lack of substantial evidence on that account." *See, e.g.*, *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1233 (Ct. Int'l Trade 2011) (citation and quotation omitted). To determine if substantial evidence supports a decision by the CIT, we review the record as a whole, including evidence that adds to, and evidence that detracts from, the "substantiality of the evidence." *Ta Chen*, 298 F.3d at 1335 (citation and quotation omitted).

That highly deferential review standard recognizes Commerce's special expertise in antidumping duty investigations. *Heveafil Sdn. Bhd. v. United States*, 58 F. App'x 843, 847 (Fed. Cir. 2003). Commerce has "broad discretion in executing" antidumping law, *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983), and we afford "tremendous deference" to Commerce's administration of those laws, *id.* at 1582. As we explained in *Fujitsu Gen. Ltd. v. United States*:

> Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and

Case: 20-2014    Document: 40    Page: 14    Filed: 07/20/2021

14                              BORUSAN MANNESMANN BORU SANAYI v.
                                      AMERICAN CAST IRON PIPE CO.

applying methodologies to implement the dictates
set forth in the governing statute, as opposed to in-
terpreting the meaning of the statue itself where
ambiguous.

88 F.3d 1034, 1039 (Fed. Cir. 1996) (citations omitted).
Factual determinations supporting antidumping margins
are thus "best left to the agency's expertise," *F.lli De Cecco
Di Filippo Fara S. Martino S.p.A. v. United States*, 216
F.3d 1027, 1032 (Fed. Cir. 2000), so we review those deter-
minations for substantial evidence, 19 U.S.C.
§ 1516a(b)(1)(B)(i).

\* \* \*

Commerce determines sales price in antidumping duty
calculations net of any post-sale price adjustment that is
reasonably attributable to sale of the subject merchandise
made during the applicable period of investigation.
19 U.S.C. § 351.401(c). The CIT has recognized that post-
sale price adjustments, as in this case, present opportunity
for manipulation by investigated parties, which arises from
"the possibility that companies would grant rebates after it
became known that certain sales would be subject to [anti-
dumping duty] review, thus decreasing an already estab-
lished sales price, and thus decreasing margins." *China
Steel Corp. v. United States*, 393 F. Supp. 3d 1322, 1347
(Ct. Int'l Trade 2019). To avoid such manipulation, Com-
merce's regulations provide that an investigated party
seeking a post-sale price adjustment must prove that "buy-
ers were aware of the conditions to be fulfilled and the ap-
proximate amount of the rebates at the time of sale." *Id.*
(internal citation and quotation omitted).

We hold that Commerce's original Final Determination
that Borusan was entitled to a post-sale price adjustment
based on the one-third initial allocation agreed to by the
JVA members because the one-third allocation was known
and established at the time of sale is supported by substan-
tial evidence and in accordance with the law.

Commerce determined that the circumstances surrounding the timing of the agreement allocating the total penalty fee weighed against valuing the post-sale price adjustment based on the full amount of Borusan's final penalty allocation. We agree. In its Final Determination, Commerce specifically analyzed whether the JVA members' allocation of the total penalty fee was established and known to the client at the time of sale. J.A. 5071–72; *see also* Large Diameter Welded Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 84 Fed. Reg. 6,362 (Feb. 27, 2019). Commerce determined that the final allocation method was not established or known to the client "because the parties negotiated their shares of the fee after the fee was imposed." J.A. 5072. Although the client was aware that the three members would eventually evenly split responsibility for any damages, the client was not aware of the method the JVA members actually adopted. Commerce reached this conclusion based not only on the timeline of the contracts, but also because Borusan repeatedly changed its claimed post-sale price adjustment amount during the investigation without providing "exhibits, supporting documentation, or calculation worksheets," instead relying "only [on] vague statements." *Id.* Commerce stated that the changing terms after the initiation of the investigation cast "significant doubt on the legitimacy of the allocation." *Id.*

Borusan admitted that the JVA members' agreement on the penalty allocation did not materialize until June 2018, "well after the initiation of this investigation." *Id.* (noting that the investigation was initiated on January 17, 2018, and the penalty was not finalized until June 2018). Commerce found that only after the final penalty amount was determined "did the [JVA] members apportion among themselves the penalties for which each [JVA] member was responsible." *Id.* Indeed, the JVA members "negotiated their shares of the fee after the fee was imposed." J.A. 5071–72.

Commerce's determination that the final allocation was not established and known to the client at the time of sale is supported by substantial evidence. Only the JVA—not the Consortium Agreement or the Sales Contract—provided that any penalties the JVA members incurred would be reimbursed by the party failing to fulfill its obligations. J.A. 2278. The client was not a party to the JVA, J.A. 2231 (Borusan admitting that the client "was not a party to [the joint venture] agreement"); the client did not receive the full JVA, J.A 2776, 2903–04; Opening Br. 17–19; and the client was not informed of the final allocation method prior to the investigation, Response Br. at 14 ("[N]either the Sales Contract nor the Consortium Agreement documents addressed at all the issue of allocation."). The CIT incorrectly concluded that "[t]he Sales Contract expressly incorporates the [JVA] by reference," J.A. 21–23, when in fact it was the Consortium Agreement, Appendix L, not the JVA, that was incorporated by reference into the Sales Contract. J.A. 2903–04 (the Consortium Agreement, Appendix L to the Sales Contract). The Consortium Agreement does not provide that the parties would apportion the penalties among themselves according to blame or reimburse one another. Rather, the Consortium Agreement incorporated into the Sales Contract assigns each JVA member a one-third share of responsibility and provides that the JVA members shall be jointly and severally liable towards the client. *Id.*; Response Br. 14. Thus, the client did not have before it the provisions in the JVA regarding apportionment by blame and therefore could not have known at the time of sale of those provisions. That the client understood that allocation among the JVA members would be in equal shares is supported by the record evidence that the client billed all three JVA members an equal share of the total penalty. J.A. 5173.

Commerce's determination of the post-sale price adjustment was also in accordance with law. *See* Modification, 81 Fed. Reg. at 15,645. We disagree that there must

be actual manipulation of post-sale price adjustment data in order for Commerce to reject a proposed post-sale price adjustment. Commerce's regulation speaks to potential, not actual, manipulation of data. To be clear, this does not mean that Commerce can or must reject a proposed post-sale price adjustment solely upon a showing of potential manipulation. Whether or not to accept a proposed post-sale price adjustment must be based, as it is in this case, on the circumstances surrounding the proposed post-sale price adjustments. Here, Commerce determined, in the course of applying the proper factors provided in its regulations, that a potential existed for manipulating the post-sale price adjustment because the claimed adjustment was not tethered to what was established and known to the client at the time of sale. Consistent with its legitimate goal of avoiding such manipulation, Commerce correctly set the post-sale price adjustment in a reasonable manner, based on evidence that existed at the time of sale, that addressed its manipulation concerns. J.A. 5073–54. Commerce's determination is supported by substantial evidence, and we find no reason to disturb that determination.

## CONCLUSION

We hold that Commerce's Final Determination assigning Borusan one-third the full penalty in the post-sale price adjustment calculation and a 5.11 percent antidumping duty rate was supported by substantial evidence and in accordance with the law. Accordingly, we reverse the CIT's judgment to the contrary. The court has considered the parties' remaining arguments and does not find them persuasive.

## **REVERSED**

### COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S.,**
*Plaintiff-Appellee*

**UNITED STATES,**
*Defendant*

**v.**

**AMERICAN CAST IRON PIPE COMPANY, BERG STEEL PIPE CORP., BERG SPIRAL PIPE CORP., DURA-BOND INDUSTRIES, STUPP CORPORATION, INDIVIDUALLY AND AS MEMBERS OF THE AMERICAN LINE PIPE PRODUCERS ASSOCIATION, GREENS BAYOU PIPE MILL, LP, JSW STEEL (USA) INC., SKYLINE STEEL, TRINITY PRODUCTS LLC, WELSPUN TUBULAR LLC USA,**
*Defendants-Appellants*

---

2020-2014

---

Appeal from the United States Court of International Trade in Nos. 1:19-cv-00056-JAR, 1:19-cv-00080-JAR, Senior Judge Jane A. Restani.

---

DYK, *Circuit Judge*, dissenting.

As the United States Court of International Trade (Trade Court) held, I think that the Department of Commerce's decision here was not supported by substantial evidence and, on its face, was arbitrary and capricious.  I respectfully dissent.

I

In antidumping proceedings, the prices used by Commerce to calculate normal value are subject to several adjustments.  *See* 19 C.F.R. § 351.401(b).  One such adjustment is a price adjustment, which is defined as "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale . . . , that is reflected in the purchasers net outlay."  *Id.* § 351.102(b)(38) (citing *id.* § 351.401(c)).  When determining normal value on the basis of home-market sales prices, Commerce "normally will use a price that is net of price adjustments . . . that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)."  *Id.* § 351.401(c).  However, Commerce "will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of [Commerce], its entitlement to such an adjustment."  *Id.*

Commerce adopted "a non-exhaustive list of factors that it may consider in determining whether to accept a price adjustment that is made after the time of sale."  Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15,641, 15,641 (Mar. 24, 2016).  Commerce concluded that,

> [i]n determining whether a party has demonstrated its entitlement to such an adjustment, the Department may consider:  (1) Whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale,

and whether this can be demonstrated through documentation; (2) how common such post-sale price adjustments are for the company and/or industry; (3) the timing of the adjustment; (4) the number of such adjustments in the proceeding; and (5) any other factors tending to reflect on the legitimacy of the claimed adjustment. The Department may consider any one or a combination of these factors in making its determination, which will be made on a case-by-case basis and in light of the evidence and arguments on each record.

*Id.* at 15,644–45. The purpose of the rule, as applied here, is to avoid manipulation. *Id.* at 15,644 ("These final modifications continue to . . . prevent the potential manipulation of dumping margins through certain post-sale price adjustments."). The concern with manipulation arises because decreases in the home-market price (normal value) as a result of a downward price adjustment reduce the magnitude of dumping.

## II

To understand the arbitrary nature of Commerce's decision in this case, it is necessary to briefly describe the underlying facts. This case centers around the sale of large-diameter pipe to construct a pipeline in Turkey. On September 10, 2013, almost four-and-a-half years prior to the filing of the petition for the antidumping investigation, Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. and two other suppliers signed a joint venture agreement forming a consortium to bid on a solicitation for large-diameter pipe. In this agreement, each of the consortium members agreed to be responsible for any damages payments to the customer stemming from the pipeline project contract that was caused by that individual member's failure to perform its obligations. Each party was responsible for about one-third of the deliverables.

Shortly thereafter, on October 14, 2014, over three years prior to the filing of the petition for antidumping investigation, the consortium members entered into the sales agreement with the customer for the pipes. This agreement included a liquidated damages clause (governing the delayed delivery of goods), a joint and several liability clause, and a summary of the consortium's 2013 joint venture agreement (titled, "Consortium Agreement"), among other provisions. The summary did not address how the consortium members planned to split any damages flowing from breach of the customer agreement. The liquidated damages clause required the consortium to pay the customer an established penalty rate for each day that the delivery of goods was delayed. The joint and several liability clause stated that the consortium members were jointly and severally responsible for the obligations under the sales agreement.

On June 9, 2017, and September 6, 2017, prior to the initiation of the antidumping investigation, the customer informed the consortium that, based on delayed deliveries, it calculated that the consortium owed it millions of dollars in damages stemming from the sales agreement's liquidated damages clause. Commerce initiated the present investigation on February 9, 2018. On May 28, 2018, the customer adjusted its demand downward by about 50% of the original total. Following receipt of the lowered demand, the customer and the consortium reached an agreement to settle the liquidated damages claim for an even lesser amount on or around June 11, 2018, and on that same day, the consortium members agreed to a protocol dividing the customer's damages claim based on the delay caused by each consortium member as they had agreed in their joint venture agreement. Borusan was responsible for more than one-third of the liquidated damages because it was responsible for more than one-third of the late deliveries. The required payments to the customer were made

in late June 2018, and Borusan reimbursed its joint-venture partners in early July 2018.  On August 20, 2018, Commerce issued its preliminary determination decision memorandum.

## III

Commerce determined that, while Borusan was entitled to a post-sale price adjustment equal to one-third of the amount paid to the customer, Borusan was not entitled to the amount that it actually paid (over twice the one-third amount) by virtue of its agreement with its joint venture partners.  If Commerce had granted the post-sale adjustment as claimed by Borusan in the first instance, Borusan would have had a de minimis dumping margin (as evidenced by Commerce's decision on remand).

Commerce did not rely on factors (2), (3), and (4) of the rule in rejecting the claimed adjustment.  There is no suggestion that that the type of liquidated damages penalty at issue here (delay damages) would be uncommon in this industry (factor (2)); the timing the adjustment itself was not suspect (factor (3)); and this was the only adjustment (factor (4)).  Commerce's decision relying on the other two factors is without a reasonable basis for at least three reasons.

First, Commerce denied Borusan's claimed post-sale price adjustment as inappropriate because the adjustment was not determined in the customer agreement (factor (1)).  But Commerce failed to explain why there was any relevant difference between a sales agreement with a customer and a consortium agreement among suppliers.  In antidumping investigations, like all other areas of agency action, "it is well-established that 'an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.'" *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration in original) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).  Commerce's

rationale for distinguishing between the two agreements here was completely unexplained.

In particular, Commerce provided no rationale as to why the consortium agreement between suppliers, as compared to the agreement between the suppliers and the customer, was more susceptible to manipulation and thus should be discounted. Much like the sales agreement with the customer, which was signed over three years prior to the antidumping investigation, Borusan and the other two suppliers signed the consortium agreement over four years before the antidumping investigation. The terms of the consortium agreement as signed could not be, and were not, changed as a result of the investigation.

Second, Commerce's suggestion that the amount paid by Borusan was suspect (factor (5))—because it was not calculated until the investigation began—is inconsistent with Commerce's willingness to accept a post-investigation calculation of the amount paid to the customer as "legitimate," J.A. 5073, even though calculated after the proceeding began. In each case, the principle governing the calculation was established before the proceeding began.

Third, contrary to the majority's conclusion, the record does not support Commerce's characterization that the changing terms of Borusan's requested price adjustment was somehow suspicious (factor (5)). Commerce concluded that "[t]he changing terms of the late penalty fee after the initiation of the investigation cast[] significant doubt on the legitimacy of the allocation of this expense among the consortium members." *Id.* at 5072. The timeline, however, simply shows that Borusan was negotiating the liquidated damages penalty that led to the requested adjustment with its customer in an attempt to reduce the penalty as the investigation was ongoing and periodically reported this to Commerce. This reduction resulted in a higher normal value, which would have been unfavorable to Borusan in

the antidumping proceeding.  The amount of Borusan's requested adjustment changed because the customer's demand changed and because Borusan did not reach a settlement agreement with the customer until on or around June 11, 2018.

Commerce also faults Borusan because it "did not file the final settlement agreement until July 6, 2018, which was little over a month before the *Preliminary Determination.*"  *Id.* at 5072–73.  This ignores that Borusan did not reach a final settlement agreement with the customer until around mid-June and did not make the payment required by the settlement to the customer until late June 2018.  There was no delay in providing Commerce with the relevant information.  And, as emphasized by the Trade Court, Commerce "independently verified [Borusan's] post-sale price adjustment based upon information that [Borusan] placed on the record."  *Id.* at 25.

## CONCLUSION

In my view, Commerce's determination that Borusan was not entitled to a post-sale price adjustment in the amount claimed was not supported by substantial evidence and was arbitrary and capricious.  I respectfully dissent.